No. 33,735

J. Phillip Strain et al., *Appellees*, v. The Cities Service Gas Company, *Appellant*.

(83 P. 2d 124)

Opinion filed October 8, 1938.

*Charles W. Garrison,* of Garnett, *A. M. Ebright, R. E. Cullison* and *Glenn W. Clark,* all of Bartlesville, Okla., for the appellant.

*Bert L. Woods* and *J. Q. Wycoff,* both of Garnett, for the appellees.

The opinion of the court was delivered by

Allen, J.: By this action certain landowners, appellees herein, seek an injunction to restrain the taking or appropriation of any portion of their land by the Cities Service Gas Company, appellant, under condemnation proceedings. Judgment was for the plaintiffs, and the gas company brings this appeal.

The property of the appellees sought to be appropriated "is a horizontal stratum of the thickness of 480 feet, beginning at a horizontal plane 570 feet subjacent to the surface of said land and ending at a horizontal plane 1,050 feet subjacent to said surface, excepting therefrom said oil sand and a horizontal stratum containing same 50 feet thick, the top of which is 670 feet below said surface," together with necessary easements, to be used by the gas company as a storage reservoir for gas.

In the petition for condemnation the appellant states that it is a gas pipe-line company and also a gas company, and that it is now and has for many years been engaged in producing, buying, transporting, storing, selling and delivering natural gas; that it sells gas to public utility companies supplying domestic consumers in more than one hundred cities in Kansas and Missouri; that it also sells gas directly to federal and state institutions in Kansas. The petition alleges that because of the sudden and drastic changes in the temperature in Kansas and Missouri during the colder seasons of the year, it is necessary for the petitioner, in order to maintain continuous, dependable and uniform service to its customers, not only to increase the pressure at its compressor stations, but it is also necessary to have storage reservoirs to hold the gas in readiness for delivery as needed; that the storage reservoirs will obviate the danger to the gas consumers that would result from an interruption of the gas supply; that to accomplish this end it has established gas storage reservoirs in depleted gas sands at three different places in Kansas, and has found it necessary to establish another underground reservoir in a fourth depleted field. It is further alleged that there is a depleted gas field in Anderson county, known as the "South Welda field," consisting of about 4,000 acres; that the gas transportation line of petitioner runs through this field; that it has secured gas-storage leases from all the landowners except the landowners involved in this action; that these landowners refuse to grant storage rights except at an exorbitant price, and that it is necessary to appropriate this land by condemnation proceedings.

The petition for condemnation was filed in the district court of Anderson county in February, 1937; appraisers were appointed, but they failed to agree. Thereupon a supplemental petition was filed, appraisers were appointed, notice given, and a report of their proceedings filed with the clerk of the court. In April, 1937, the gas company paid to the clerk of the court the amount of the award of the appraisers, together with the fees of the appraisers and costs. A transcript of the proceedings was filed with the register of deeds. The landowners appealed.

In the petition for the injunction it was alleged:

"That said pretended condemnation proceedings are null, void and of no effect, due to the reasons herein stated.

"That there is no law under which the land of these plaintiffs, or any interest or easement therein, can be taken or appropriated, against these plaintiffs' will, for the purpose for which said land is sought to be appropriated in said pretended condemnation proceedings.

"That the purpose for which said land, or an easement therein, is sought to be taken under said pretended condemnation proceedings is for private purposes, not for public uses, and is not such a use as would entitle defendant to the right of eminent domain.

"That an interpretation of the alleged laws under which said pretended condemnation proceedings were had, interpreting said laws to apply favorably with said pretended condemnation proceedings, would be unconstitutional and void.

"That the proceedings in said pretended condemnation proceedings are illegal and void, and are contrary to the general eminent domain laws of the state of Kansas.

"That an *ex parte* finding of said court without notice to these plaintiffs, and without a hearing whereat these plaintiffs were given an opportunity to present themselves and be heard on the matter, deprives these plaintiffs of their constitutional right, their day in court, and is an attempt to take the property of these plaintiffs without due process of law."

The trial court held there was no legislative sanction for the proceedings. This is the vital question in the case.

It is the settled law that private property is not to be taken for private use. In *Bangor and Piscataquis R. R. Co. v. McComb*, 60 Me. 290, 295, this fundamental concept was thus expressed:

"This exercise of the right of eminent domain is, in its nature, in derogation of the great and fundamental principle of all constitutional governments, which secures to every individual the right to acquire, possess, and defend property. As between individuals, no necessity, however great, no exigency, however imminent, no improvement, however valuable, no refusal, however unneighborly, no obstinacy, however unreasonable, no offers of compensation, however extravagant, can compel or require any man to part with an inch of his estate. The constitution protects him and his possessions, when held on, even to the extent of churlish obstinacy."

See *Irrigation Co. v. Klein*, 63 Kan. 484, 488, 65 Pac. 684; *Comm'rs of Shawnee Co. v. Beckwith*, 10 Kan. 603.

The power of eminent domain can only be exercised by virtue of a legislative enactment. The right to appropriate private property to public use lies dormant in the state until legislative action is had, pointing out the occasions, modes, conditions and agencies for its appropriation. (1 Lewis, Eminent Domain, 3d ed., § 367.)

In *Comm'rs of Shawnee Co. v. Beckwith*, 10 Kan. 603, it was said:

"No man can be divested of his land, or of any part thereof or interest therein, through the exercise of the power of eminent domain, or of any other power, except under the provisions of express and positive constitutional or statutory law; and he cannot be divested through the exercise of such power of any more or greater interest in his land than the constitution or statutes expressly provided for." (Syl. ¶ 1.)

We must find in our statutes authority for this condemnor to take

the subterranean sands of these landowners for a gas-storage reservoir.

Our statute, G. S. 1935, 26-101, outlines the procedure for the condemnation of land by a corporation having the right of eminent domain. It contains no grant of power.

Section 17-618 provides that lands may be appropriated for the use of oil companies, pipe-line companies, and for the piping of gas "in the same manner as is provided . . . for railway corporations, as far as applicable;" and any oil company, pipe-line company or gas company desiring the right to conduct oil in pipes or to conduct gas in pipes, may obtain such right or the right of way for all necessary pipes "in manner as aforesaid;" and such pipes may be laid on, through or over any land or lot, or through any street or alley or public ground of any city of the second or third class.

Our statute authorizing railway corporations to condemn land, referred to in the foregoing section, being G. S. 1935, 66-901, provides for the taking of a strip of land one hundred feet wide for its right of way "and also such land as may be deemed necessary for sidetracks, depots and workshops, and water stations, materials for construction, except timber, a right of way over adjacent lands sufficient to enable such company to construct and repair its roads and stations, and a right to conduct water by aqueducts, and a right of making proper drains."

The evolution of these statutes has been traced in our decisions and need not be repeated. (See *La Harpe v. Gas Co.*, 69 Kan. 97, 76 Pac. 448; *Ritchie v. Atchison, T. & S. F. Rly. Co.*, 128 Kan. 637, 279 Pac. 15.)

As stated above, the principal question in the case is the right of the appellant to condemn land for the underground storage of gas. The trial court held the statutes do not give appellant that right. Certainly the statutes do not do so in express terms. Normally, at least, statutes granting the right of eminent domain should never be enlarged by implication. Appellant contends, and its reasoning leads to that end, that the statutes should be interpreted as giving it the right to condemn any property necessary, or which it deems necessary, in the conduct of its business. Obviously, this contention is too broad. It would authorize appellant to condemn any land in which its officials thought gas might be found, if more gas than it had available was thought necessary to supply its demands. This would disrupt the whole theory of gas ownership, production and

distribution which now prevails. Certainly our legislature never contemplated granting gas companies such authority.

Here appellant sought to condemn for gas storage a tract of land known to contain two gas sands and one oil sand and possibly more of each. Appellant says gas in the gas sands has been exhausted. Appellees contend otherwise. The trial court was of the opinion that whether the gas in the known sands was exhausted was not material on the question of plaintiff's right to condemn. In other words, that plaintiff's right to condemn for gas storage purposes does not depend on how many gas sands there are in the land or whether any or all of them have been exhausted. It seems to us that necessarily is true. It also seems to be true that if appellant has a right to condemn land in which to store gas, irrespective of whether the land contains one or more known gas sands or whether such sands have been depleted of gas, it would have the same right to condemn the land if it knew or thought it contained gas-bearing sand from which the gas had not been taken, for the purpose of taking the gas therefrom, if such gas was needed in the conduct of its business.

The use of the earth as a storage place for gas is an idea so novel we cannot believe the legislature had such matter in contemplation when the power of eminent domain was given to pipe-line companies. If the rights contended for by appellant are to be given to gas pipeline companies, it is a matter for the consideration of the legislature. To stretch the statute to cover the case here presented would be little short of judicial legislation.

In this view of the case it becomes unnecessary to review the other questions pressed upon us. The judgment of the trial court is affirmed.

ALLEN, J. (dissenting): I think the judgment should be reversed.

The power of eminent domain may be delegated by the legislature to private corporations which discharge a public duty, or are designed to promote the public convenience. (*Irrigation Co. v. Klein*, 63 Kan. 484, 65 Pac. 684; Black on Constitutional Law, 4th ed., 458.)

The legislature of this state has delegated that power to railroad companies, macadam road, plank road, telegraph, hydraulic, gas, oil, pipe-line, irrigating, and other public-service companies.

Appellees contend that the appellant has no right under the laws of this state to condemn the land of appellees for a gas-storage reservoir. It will be observed that the corporation statute, G. S.

398

1935, 17-618, provides that "lands may be appropriated for the use of . . . oil companies, pipe-line companies, and for the piping of gas in the same manner as is provided in this article for railway corporations as far as applicable." The contention that the appellant can only take land for a right of way for a pipe line is not borne out by the statute. The express language is that lands may be appropriated "for the use of" such companies "and for the piping of gas."

Oil, gas and pipe-line companies are authorized to take land in the same manner as railway corporations as far as applicable. Does this refer to matters of procedure alone? If so, it would appear to be a useless duplication, as the eminent-domain statute G. S. 1935, 26-101, provides the procedure for corporations having the right of eminent domain. The more rational construction would be that such corporations may take land for purposes similar to the purposes allowed railway corporations. The railway statute is to be applied to pipe-line companies *as far as applicable.* Under G. S. 1935, 66-901, railways may take land deemed necessary for sidetracks, depots, workshops, water stations, etc. So we have held railway companies may take land for a spur track (*Dotson v. Railway Co.,* 81 Kan. 816, 106 Pac. 1045) and land separate and apart from its right of way for a water station. (*Dillon v. Railroad Co.,* 67 Kan. 687, 74 Pac. 251.)

Under our statute, G. S. 1935, 66-105, pipe-line companies are declared to be common carriers. Under 66-104, companies organized for the conveyance of oil and gas through pipe lines for general commercial purposes are declared to be public utilities. As such common carriers and public utilities they are subjected to supervision and regulation by the state. (G. S. 1935, ch. 66.) In *Dillon v. Railroad Co.,* supra, it was said: "Railroad companies are public carriers and are properly held to the highest accountability in the performance of their duties. It is highly important to the general traveling public, as well as to business interests, that such corporations have exclusive possession and uninterrupted control of all property, the use of which is necessary in the discharge of this service." (p. 692.) The same reasoning applies to this utility.

It will hardly be contended that the power of eminent domain granted to gas and pipe-line companies is limited to a mere right of way for the pipe line. Equipment necessary for the transportation of gas through pipe lines is thus stated by counsel for appellant:

"Compressor stations are necessary along that line at intervals not greater than seventy-five miles, ordinarily, to force the gas through the line; fence stiles and gates are necessary for patrolling the line; scrubbers are necessary to clean the gas that goes through the line; pipe yards and warehouses at intervals along the line are necessary; regulators are necessary to regulate the pressure at which the gas is delivered; meters and measuring stations are necessary to measure the amount delivered; heaters and heater houses at metering or regulating points are necessary; gate-valve assemblies are necessary to change the direction of the flow of gas and shunt it into other lines; large header or expansion casing and multiple pipes at river crossings are necessary; dehydrators are necessary to remove the moisture from the gas; drips are necessary to remove condensation and precipitation of liquids; enveloping casings are necessary at highly hazardous points; and storage reservoirs or expansion chambers are necessary to give the proper dependability, pliability and continuity to the necessary deliveries. A mere pipe without any of these things would be as useless as the case of a watch without the works. We therefore contend that storage reservoirs are nothing more than expansion chambers and are an integral part of the transportation or piping of gas. If, where the 16-inch line runs through the Strain land, a pipe many times the diameter of that line had been inserted as an expansion chamber, the right to do so would not have been doubted. The storage reservoir is not different in kind but only in degree from the pipe that holds the gas. It is very usual for companies to insert larger portions of pipe and, indeed, to erect aboveground holders, to secure this pliability or power of accommodation of supply to sudden changes in demand. We do not think anyone would contend that these enlarged pipes or these holders were not an integral part of the transportation of gas."

It would seem that sites for compressor stations, pipe yards and warehouses, storage reservoirs and expansion chambers, etc., are as necessary for this public utility as sites for depots, workshops and switch yards are to a railroad company. The testimony in the record as to the necessity for the gas-storage reservoir was uncontradicted. Under the statute, the pipe-line company is given the same right of condemnation as railway companies. That which is essential to its operation in the service of the public as a public utility is within the authority of the statute.

In the opinion of the court it is stated that if the appellant has a right to take land to store gas where the sand has been depleted of gas, it would have the same right to condemn land containing gas-bearing sand if such gas were needed in the conduct of its business— that it would disrupt the whole theory of gas ownership, production and distribution. In my view, this pronouncement completely overlooks the protection given the landowner by the settled law of eminent domain.

The purpose for which the power of eminent domain may be exercised must be public. The legislature cannot authorize a taking for a strictly private use, even upon payment of compensation. (20 C. J. 546.) The necessity and expediency of taking private property for public use under the power of eminent domain is a question for the legislature, with which the courts do not interfere. But the question of whether or not the purpose of the appropriation is a public one is a judicial question. (*Irrigation Co. v. Klein*, 63 Kan. 484, 65 Pac. 684.) In *Rindge Co. v. Los Angeles*, 262 U. S. 700, 43 S. Ct. 689, 67 L. Ed. 1186, it was said:

"The nature of a use, whether public or private, is ultimately a judicial question. However, the determination of this question is influenced by local conditions; and this court, while enforcing the fourteenth amendment, should keep in view the diversity of such conditions and regard with great respect the judgments of state courts upon what should be deemed public uses in any state. *Fallbrook Irrigation District v. Bradley*, 164 U. S. 112, 158, 160; *Hairston v. Danville Railway*, 208 U. S. 598, 606, 607 . . . In determining whether the taking of property is necessary for public use, not only the present demands of the public, but those which may be fairly anticipated in the future, may be considered. *Central Pacific Railway v. Feldman*, 152 Cal. 303, 309." (pp. 705, 707.)

An attempt by any public-service company to take gas sands, depleted or undepleted, if for a private purpose, would be unlawful. The landowners' rights are protected by the law, and will be enforced by the courts.

If, on the other hand, the taking is for a public use, any property above or beneath the surface of the earth may be appropriated. Mr. Justice Brewer, speaking for the court in *Long Island Water Supply Co. v. Brooklyn*, 166 U. S. 685, 17 S. Ct. 718, 41 L. Ed. 1165, said:

"All private property is held subject to the demands of a public use. The constitutional guarantee of just compensation is not a limitation of the power to take, but only a condition of its exercise. Whenever public uses require, the government may appropriate any private property on the payment of just compensation . . . It matters not to whom the water-supply system belongs, individual or corporation, or what franchises are connected with it—all may be taken for public uses upon payment of just compensation." (p. 689.)

In *Strickley v. Highland Boy Gold Mining Co.*, 200 U. S. 527, 26 S. Ct. 301, 50 L. Ed. 581, condemnation of an aerial-bucket line from a mine upon the mountain side, across a placer-mining claim, to a railroad in the valley below, was sustained. If one mining company may condemn an aerial-bucket line over a neighboring mine as a public use, it would seem a pipe-line company could take depleted

gas sands as a storage reservoir. The suggestion that such appropriation would establish a doctrine that would disrupt the whole theory of gas ownership, production and distribution would seem to be without any substantial foundation.

In *La Harpe v. Gas Co.*, 69 Kan. 97, 76 Pac. 448, decided in 1904, the production and distribution of gas was recognized as a public necessity. Since that time it has become one of the most important industries of the state. A dependable, steady and uniform flow of gas by the pipe-line company is necessary to the comfort, health and safety of the people. A break in the pipe line might cause death and disaster in a hundred cities. Storage reservoirs are shown to be necessary for efficient service to the public, and to guard against the danger from interrupted service.

I think the authority to condemn this land is clearly given by the statute, and I am unable to see any merit in the other reasons advanced in the majority opinion.

In the larger view we have the same problem that confronted this court in *McCann v. Telephone Co.*, 69 Kan. 210, 76 Pac. 870. It is to be regretted that the liberal outlook there expressed, and which has measurably contributed to the economic and social welfare of the state, has been departed from. If the doctrine of those who believed that "the whole duty of government is ·to prevent crime and to preserve contracts" had prevailed in the great case of *Charles River Bridge v. Warren Bridge et al.*, 11 Pet. 420, the construction of our railway systems, and the expansion of the country might have been retarded for a generation. (2 Warren, The Supreme Court, pp. 295, 312.)

DAWSON, C. J., joins in this dissent.

WEDELL, J. (concurring specially): I concur in the decision of the majority. It seems to me the lawmakers intended by the provisions of G. S. 1935, 17-618, to grant the right to condemn land for pipe-line purposes and for such use as is reasonably necessary to effectuate such pipe-line purposes. I do not think it intended to grant the right to condemn the subsurface for any use which might be desired to be made of it. Clearly it did not expressly grant the right to condemn the subsurface for storage purposes. The storage of gas is primarily designed to conserve it for future use. The piping of gas is designed to deliver it for consumption. These are two essentially different things. In other words, it would appear the lawmakers in-

tended to provide the means of transporting gas for consumption and not the means of conserving it by storage. The storage of huge quantities of gas in gas-bearing sands, or in sands capable of holding gas might, under sufficient pressure, very reasonably embrace many sections of land. To hold, in effect, that such gigantic underground reservoirs of gas constituted a mere bulge in a pipe line, in my judgment, is not to give the statute a liberal construction but to inflate and expand it to the bursting point. Such a result constitutes not interpretation but legislation in fact.

Let us consider further for a moment that portion of the statute which pertains to use. The pertinent portion of G. S. 1935, 17-618, reads:

"Lands may be appropriated for the use of . . . oil companies, pipe-line companies, and for the piping of gas in the same manner as is provided in this article for railway corporations as far as applicable, . . ."

The logical result of the minority view is that oil companies and pipe-line companies were granted the right to condemn not only that portion of the land which is ordinarily considered as necessary for pipe-line purposes, but that they were also authorized to condemn the entire subsurface of the land for their own use and that such use is entirely unrestricted. If that was the true intent, then any oil company or any pipe-line company may condemn any private lands and any private oil and gas leases irrespective of the use or uses to which such lands or leases are to be put. I cannot conceive that such could possibly have been the legislative intent, and I do not consider it a badge of liberalism to hold the statute granted such general and unrestricted powers.

That the lawmakers may come to recognize the need for underground storage of gas for the purpose of emergency service or even ordinary service, to densely populated areas, may be conceived. That they may desire to expand even the right of eminent domain to effectuate that purpose, under proper restrictions and regulations, is likewise not impossible. That they have not yet expressly or by clear implication done so, seems clear. That the power of eminent domain can be exercised only by virtue of legislative and not by judicial authority, is universally conceded. For courts to encroach upon the salutary principle of permitting our citizens to make their own laws through their own duly constituted representatives, is not a sign of liberalism. We will do well to leave legislation to the lawmaking bodies where, under our present system at least, it still belongs. And this is especially true with respect to disturbing the

rights of citizens with a strong hand and under the guise of the drastic remedy of eminent domain.

If the interpretation of the majority is in error, the lawmakers will be definitely informed of our view and within a few months will have an opportunity to provide in clear and unmistakable terms that these companies shall have the right to condemn private lands and oil and gas leases for storage purposes. Industrial progress, if such it is, need therefore not be retarded very long. Moreover, it is the province of the lawmaking body to determine, first, whether it would in fact regard such a provision as constituting an aid to industrial progress, and second, if it did in fact so regard it, whether it, and not the judicial branch of the government, desired to provide for it. Time within which to write my views fully on this subject is entirely too limited, as we are now engaged with other duties.

On behalf of the appellant, I may also say, that while I do not agree with its contention on the subject of estoppel, I do think it is entitled to have that contention treated in the opinion, since it insists it is entitled to a judgment of reversal even though we affirm the judgment of the trial court on the condemnation feature of the case.