No. 57,233

LOWELL L. ANDERSON, AILEEN R. ANDERSON, and AVANTI PETRO-
LEUM, INC., *Plaintiffs-Appellees*, v. BEECH AIRCRAFT CORPORA-
TION, *Defendant-Appellant.*

(699 P.2d 1023)

Opinion filed May 10, 1985.

*Timothy E. McKee,* of Martin, Pringle, Oliver, Triplett & Wallace, of Wichita, argued the cause, and *Martin W. Bauer,* and *Eric S. Strickler,* of the same firm, were with him on the briefs for appellant.

*Cecil E. Merkel,* of Merkel & Cline, of Wichita, argued the cause, and *Charles M. Cline,* of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

PRAGER, J.: This is an action brought by the owners of a tract of land and the lessee under an oil and gas lease against Beech Aircraft Corporation to quiet title, to recover damages for slander of title and trespass, and for an accounting. The basic dispute is over the ownership of non-native gas injected by Beech Aircraft

into an underground reservoir used by Beech for gas storage for many years and which gas the plaintiffs now seek to produce. Plaintiffs are Lowell L. Anderson and Aileen R. Anderson, the landowners, and Avanti Petroleum, Inc., the lessee under an oil and gas lease on the Anderson property.

This case is before the court on an interlocutory appeal, pursuant to K.S.A. 60-2102(b), from an order of the district court which granted plaintiffs partial summary judgment on their quiet title claim and which held that the plaintiffs were entitled to produce any non-native gas injected for storage by Beech Aircraft which entered into plaintiffs' property.

The facts are not disputed and were stipulated to be as follows:

"1. This action pertains to the Stalnaker gas reservoir underlying the Beech Aircraft Corporation's land which adjoins the Anderson farm. In years past native gas was produced from the Stalnaker reservoir and after a substantial depletion thereof Beech Aircraft Corporation (Beech) bought gas from interstate pipelines and injected it through wells located on Beech's property into the Stalnaker reservoir where it was stored for later use by Beech in its plant.

"2. Adjoining the Beech land is the Anderson farm owned by the plaintiffs, Lowell L. Anderson and Aileen R. Anderson (Anderson).

"3. Beech has no lease, license or permit covering the Anderson farm.

. . . .

"4. The plaintiff, Avanti Petroleum (Avanti), holds an oil and gas lease on the Anderson farm and has drilled a well on the Anderson farm which is producing from the Stalnaker reservoir.

"5. The gas produced from the Avanti well is gas previously injected for storage by Beech in the Stalnaker reservoir.

"6. Thus, plaintiffs' Motion should be considered on the basis that the plaintiffs are producing gas from the Anderson farm which was originally purchased and stored by Beech in the Stalnaker reservoir by injection through wells located on Beech's property."

Before considering the appeal on its merits, we must first dispose of a jurisdictional issue raised initially by the Court of Appeals. Following the docketing of the appeal, the Court of Appeals issued a show cause order requiring the parties to show why the appeal should not be dismissed for lack of jurisdiction. Both parties responded, urging the court to take jurisdiction of the interlocutory appeal. The parties were directed to brief the issue of jurisdiction for consideration at the time of argument.

To determine the jurisdictional issue, we must consider the following chronology of events occurring in the district court: On July 27, 1984, the district court entered its order granting partial

summary judgment which vested title in the plaintiffs to the gas produced by the plaintiff from their own property and which had been previously reinjected for storage by Beech. The journal entry did not contain the statutory language required by K.S.A. 60-2102(b) for an interlocutory appeal. That section permits an interlocutory appeal from a district court order involving a controlling question of law as to which there is substantial ground for difference of opinion and where an immediate appeal from the order may materially advance the ultimate termination of the litigation. That section also provides that the district court shall state in writing its findings in that regard in the order from which the appeal is to be taken. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order. Supreme Court Rule 4.01 (235 Kan. lxv) at that time required that an application for permission to take an interlocutory appeal be served within ten days after the filing of the interlocutory order from which the appeal is sought to be taken.

On August 6, 1984, the defendant made an oral motion to alter and amend the original judgment pursuant to K.S.A. 60-259, so that the order would contain the findings of the district court necessary for the taking of an interlocutory appeal. On the same day, the district court amended its judgment and order of July 27, 1984, to include the necessary findings.

On August 16, 1984, ten days after the district court filed its amended judgment and order, the defendant filed a motion for permission to take an interlocutory appeal, which permission was granted by the Court of Appeals. Thereafter, Beech Aircraft filed a timely notice of appeal. We have considered the factual circumstances shown in the record and have concluded that this court has jurisdiction to consider on its merits the interlocutory appeal in this case.

We have reached this conclusion on the basis that the factual circumstances set forth in *Razook v. Kemp*, 236 Kan. 156, 690 P.2d 376 (1984), are distinguishable from the factual circumstances in this case. Razook involved an interlocutory appeal taken from a district court order of December 3, 1982, involving the instructions to appraisers in an eminent domain proceeding. The district court entered its order directing the appraisers to consider only certain tracts in determining the damages for a

partial taking of property. No action was taken to perfect an interlocutory appeal at that point. Nine months later, on September 20, 1983, the district court entered a separate order which contained only the findings necessary to make the December 3, 1982, order a candidate for an interlocutory appeal. Within ten days thereafter, on September 28, 1983, the owner of certain oil and gas leases filed an application to take an interlocutory appeal. The Supreme Court held that it had no jurisdiction because the order actually appealed from was the order of December 3, 1982, and not the order of September 20, 1983. Therefore, the application to take an interlocutory appeal was not timely made. The last order made by the district court in Razook was an entirely different and separate order from the earlier order and was not merely a modification of the earlier order.

In the case now before us, the factual situation is entirely different. The order for summary judgment was entered on July 27, 1984, and, on motion of the defendant filed within ten days, was amended by the trial court to include the statutory language. The order entered August 6, 1984, clearly referred to the prior order and amended it to include the requisite findings to take an interlocutory appeal. Under the circumstances, we hold that the decision in Razook is not applicable in this case and that the trial court could properly amend its original order, since a motion to amend was filed within ten days of the entry of the original order.

We also note that Supreme Court Rule 4.01 (236 Kan. iv [Adv.Sheet No. 4]) was amended effective February 20, 1985, to provide that an order may be amended to include the findings required by K.S.A. 60-2102(b), provided a motion to amend is served and filed within ten days of the filing of the order, and the application for permission to take an appeal may be taken within ten days after filing the amended order.

The general rule is that when a change of law merely affects the remedy or law of procedure, all rights of action will be enforced under the new procedure without regard to whether they accrued before or after such change of law and without regard to whether or not the suit has been instituted, unless there is a savings clause as to existing litigation. *Davis v. Hughes,* 229 Kan. 91, Syl. ¶¶ 6,7, 622 P.2d 641 (1981); *Nitchals v. Williams,*

225 Kan. 285, Syl. ¶¶ 1-3, 590 P.2d 582 (1979); *In re Estate of Laue*, 225 Kan. 177, 187-88, 589 P.2d 558 (1979). Clearly, the amendment to Supreme Court Rule 4.01 was procedural in nature and does not affect the substantive rights of the parties. Therefore, Supreme Court Rule 4.01 is to be applied retrospectively to all cases pending at the time of its adoption, February 20, 1985, and is, therefore, applicable in the present case. This court has jurisdiction to determine this appeal.

We turn now to consider the issue raised on this appeal which, simply stated, is as follows:

Do the owners of land and of an oil and gas lease have the right to produce as their own non-native gas from their land, which gas has previously been purchased, injected, and stored in a common reservoir by another landowner having no license, permit, or lease covering the land from which the non-native gas is produced?

The trial court answered this question in the affirmative. In reaching this conclusion, the trial court relied primarily on *Strain v. Cities Service Gas Co.*, 148 Kan. 393, 83 P.2d 124 (1938). In *Strain*, Cities Service sought to condemn a natural reservoir underlying Strain's property as a storage reservoir for gas to provide a continuous gas supply to Kansas and Missouri customers and to provide for peak demand of gas usage, thereby serving the public interest. This court held that the statute granting gas companies the right to condemn land for pipeline purposes was not intended by the legislature to be so broad as to authorize a natural gas public utility to condemn the entire subsurface of adjoining lands for the underground storage of gas. The court held that the power of eminent domain can only be exercised by virtue of an express legislative enactment and, in the absence of such an enactment, a natural gas public utility has no right to condemn a depleted underground reservoir for the storage of gas. In the opinion, the court stated, "The use of the earth as a storage place for gas is an idea so novel we cannot believe the legislature had such matter in contemplation when the power of eminent domain was given to pipe-line companies."

*Strain* was decided in 1938, and, since that time, the concept of underground storage of natural gas has become well accepted in the natural gas industry. Today, natural gas is being stored in

underground reservoirs in most of the gas producing states. This tremendous increase in gas storage was the result of the increased demand for, and popularity of, natural gas as a consumer fuel. The demand for natural gas far exceeded the supply, and pipelines proved incapable of supplying peak consumer demands which were mainly caused by cold weather. During periods of lesser demand, the pipelines could transport more than enough gas. Above ground storage of gas was impossible. It simply was not economically feasible to fabricate containers large enough to serve all consumers. Experience proved that the problem of meeting peak consumer demands for natural gas could be solved only by the use of underground storage of gas. It became obvious that depleted oil and gas fields could be effectively converted into vast storage containers. However, suitable formations for underground storage of natural gas do not exist in all states. A formation must possess a high degree of porosity in order to accommodate large quantities of gas and must also possess a high degree of permeability to allow the gas to be injected and withdrawn rapidly. In addition to these basic requirements, the formation must be sufficiently sealed geologically to prevent migration of the injected gas.

With the underground storage of natural gas, there developed many legal problems involving the interrelationship between a gas company or a storage operator and the owners of land or mineral interests included within the storage reservoirs. These include competing claims asserting ownership of injected gas and ownership of the storage formation. One problem was the matter of the title to the non-native gas injected in an underground reservoir for storage. Other problems were concerned with the acquisition of the necessary stratum and surface land for the storage reservoir and the relative rights of the owner of the fee and the owner of a mineral interest which had previously been severed from the surface interest. Problems have also arisen in regard to the method of acquisition. One method involves voluntary acquisition by contract between the gas company and the landowners. The other alternative is the exercise of the power of eminent domain. There have been complications arising because of state regulation and also federal regulation and the conflicts arising therefrom. Finally, there has been the problem of income tax considerations as between the parties

granting storage rights and the party acquiring storage rights. Some of these problems have come before the courts and some have not. They are mentioned to show the complexity of the problems arising from the injection of non-native gas into the earth for underground storage. See also the annotation at 94 A.L.R.2d 543 on the rights and liabilities with respect to natural gas reduced to possession and subsequently stored in natural reservoirs.

The specific issue presented in this case is truly one of first impression in Kansas. As far as natural gas is concerned, Kansas has long recognized the law of capture, holding that natural gas in the ground is part of the real estate until it is actually produced and severed. At that point, it becomes personalty. *Burden v. Gypsy Oil Co.,* 141 Kan. 147, 40 P.2d 463 (1935); *Gas Co. v. Neosho County,* 75 Kan. 335, 89 Pac. 750 (1907); *In re Estate of Sellens,* 7 Kan. App. 2d 48, 637 P.2d 483 (1981), *rev. denied* 230 Kan. 818 (1982).

As underground reservoirs for natural gas have become more common, the issue of title to the stored gas has been presented to the courts. The issue of title was first addressed in *Hammonds v. Central Kentucky Natural Gas Co.,* 255 Ky. 685, 75 S.W.2d 204 (1934). In *Hammonds,* the gas company depleted an underground reservoir underlying approximately 15,000 acres and subsequently injected gas from distant wells into the reservoir for storage purposes. Della Hammonds owned 54 acres within the boundary of the reservoir which was never leased to the gas company. It was undisputed the reservoir lay under the Hammonds property. Della Hammonds sued the gas company for trespass and sought to recover damages for use and occupation of the reservoir underlying her property. The lower court held for the gas company and Hammonds appealed. The Kentucky Court of Appeals affirmed. But Hammonds won the victory in the long run. The Kentucky court initially discussed the doctrine of capture, declaring that "oil and gas are not the property of any one until reduced to actual possession by extraction, although by virtue of his proprietorship the owner of the surface, or his grantee of the severed mineral estate, has the exclusive right of seeking to acquire and of appropriating the oil and gas directly beneath." 255 Ky. at 688. The court also recognized the nature of oil and gas as being fugitive and migratory, having the power and

tendency to escape without the volition of its owner. The court analogized oil and gas to wild animals or animals *ferae naturae.* It noted that ownership in birds and wild animals becomes vested in the person capturing or reducing them to possession. However, when restored to their natural wild and free state, the dominion and individual proprietorship of any person over them is at an end and they resume their status as common property. The court also considered cases involving subterranean and percolating water where it has been held that, once the water is restored to the earth or to the running stream, a prior possessor's exclusive, individual title is lost. The court concluded in *Hammonds* that, if non-native injected gas wanders into the land of an adjoining landowner, the gas company is not liable for trespass as the gas company no longer owns the gas. See also *Central Kentucky Natural Gas Co. v. Smallwood,* 252 S.W.2d 866 (Ky. 1953).

The *Hammonds* doctrine was recognized by a Pennsylvania trial court in *Protz v. Peoples Natural Gas Co.,* 93 Pitts. Leg. J. 239, *aff'd* 94 Pitts. Leg. J. 139 (1945). The plaintiffs in that case sought an injunction to prevent the installation of a proposed gas storage facility, part of which would underly their farm, on the basis that storage constituted a continuing trespass. Injunctive relief was denied. The court held by way of dictum that the presence of this gas would not constitute an invasion of the plaintiffs' property rights since the defendant had lost title to the gas. The court did note, however, that if the plaintiffs could prove that the storage project would endanger their safety and peaceful use of their land, then perhaps injunctive relief might be available.

In *Bezzi v. Hocker,* 370 F.2d 533 (10th Cir. 1966), the plaintiffs owned a mineral interest in a 40-acre tract of land in Oklahoma. The plaintiffs reinjected natural gas into the unit wells for conservation purposes. The gas was later produced by the defendants from a well on their adjoining property. The Court of Appeals held that oil and gas are mobile and fugacious, and if they escape to other lands or come under another's control, whatever title the original owner had is lost. The court stated that under Oklahoma law, whatever title the owners of the mineral interest in the tract had to the residue gas prior to the date their mineral interest terminated was lost when the gas was reinjected

into the common source of supply and commingled with virgin gas existing there and it became subject to the law of capture. The court relied on a prior decision of the Oklahoma Supreme Court in *West Edmond Salt Water Disposal Ass'n v. Rosecrans*, 204 Okla. 9, 226 P.2d 965 (1950).

The nonownership theory which was adopted in *Hammonds* has been criticized by writers in the field. One writer argued that the theory expressed in the *Hammonds* decision is illogical and invalid for the reason that once man has reduced natural gas to possession, and processed and transported it to the storage area, the gas in no way resembles gas in its native state. Smith, *Rights and Liabilities on Subsurface Operations*, Southwestern Legal Foundation, Eighth Annual Institute on Oil and Gas Law and Taxation 1, 25-6 (1957). Several courts have refused to follow the rationale set forth in *Hammonds*.

In *White v. New York State Natural Gas Corporation*, 190 F. Supp. 342 (W.D. Pa. 1960), the plaintiffs were owners of a partial interest in proceeds from the sale of gas produced by certain wells. The plaintiffs sued the defendant gas company for an accounting and to restrain an artificial cutback in production. The defense was that the native reserve of gas in the wells was depleted and the gas presently produced was storage gas which had migrated from an adjoining underground storage pool. If defendants did not restrict production, they would be liable for wrongful taking of property belonging to the storage companies. The issue was whether title to natural gas, once having been reduced to possession, was lost by the injection of such gas into a natural underground reservoir for storage purposes. The Pennsylvania federal district court rejected the mineral *ferae naturae* concept, stating the application of that theory was limited to the original capture of native gas and oil. The court predicted the Supreme Court of Pennsylvania would hold that title to natural gas, once having been reduced to possession, is not lost by the injection of such gas into a natural underground reservoir for storage purposes, and entered judgment in favor of the defendant.

*Lone Star Gas Company v. Murchison*, 353 S.W.2d 870 (Tex. Civ. App. 1962), also rejected the rationale of Hammonds and chose to follow *White*. In that case, the Lone Star Gas Company, a gas public utility, injected non-native gas into a gas storage

reservoir which had previously been created with approval of the Railroad Commission of Texas. The defendant, Murchison, produced the stored gas from his own property by drilling into the authorized storage reservoir. The trial court held Lone Star lost title to the gas injected for storage when the gas migrated under the tract in which Murchison held a mineral lease and the law of capture applied to the gas injected for storage. The Court of Civil Appeals of Texas reversed, rejecting the wild animal concept expressed in *Hammonds.*

A more recent decision on the issue is *Ellis v. Arkansas Louisiana Gas Co.,* 450 F.Supp. 412 (E.D. Okla. 1978), *aff'd* 609 F.2d 436 (10th Cir. 1979), *cert. denied* 445 U.S. 964 (1980). In *Ellis,* a surface landowner sued a gas company for damages and injunctive relief for alleged unauthorized use by the gas company of an underground reservoir for gas storage, part of which was located under plaintiff's land. The court held the gas company had acquired a prescriptive easement to use the reservoir for gas storage. The court emphasized that its decision was limited to a factual situation where the storage reservoir was well defined and the defendant had a prescriptive easement. In that limited factual setting, the court concluded that the law of Oklahoma was that the injector does not lose ownership of the gas by injecting it into a defined underground reservoir. The court stated that *Bezzi v. Hocker,* 370 F.2d 533, was not determinative in the case.

In addition to these court decisions, there have been statutes enacted in various states to regulate the underground storage of natural gas. These statutes vary widely in their provisions. The Washington (Wash. Rev. Code Ann. § 80.40.050 [1985 Supp.]), Georgia (Ga. Code Ann. § 46-4-57 *et seq.* [1982]), Louisiana (La. Rev. Stat. Ann. § 30-22 [West 1975]), and Colorado (Colo. Rev. Stat. 34-64-101 *et seq.* [1984]) statutes provide for the condemnation of underground reservoirs for the storage of natural gas. Those state statutes provide that the injected gas shall remain the property of the injector but preserve the rights of owners to drill through the underground reservoir. The Missouri statute (Mo. Ann. Stat. § 393.500 [Vernon 1985 Supp.]), and the Oklahoma statute (Okla. Stat. Ann. tit. 52, § 36.6 [West 1969]) provide that the gas remains the property of the injector, *but such rule is not applied to a person whose land is not acquired.* In the latter

instance, it appears that both Missouri and Oklahoma have adopted the rule that such injected gas becomes subject to the law of capture if it migrates from the contained area. The New Mexico act (N.M. Stat. Ann. § 70-6-8 [1978]) also contains the exceptions presented in the Missouri and Oklahoma statutes. These various statutes are cited in order to show the wide variations in the legislative policy governing the creation of underground gas storage facilities and the condemnation of land for that purpose.

With this background in mind, we turn now to the statutory scheme adopted in Kansas. As noted previously, in *Strain v. Cities Service Gas Co.,* 148 Kan. 393, this court held that a natural gas public utility did not have the power to condemn property in order to create an underground gas storage area. After the decision in *Strain,* there was nothing to change the law of Kansas until 1951 when the legislature enacted K.S.A. 55-1201 *et seq.,* which regulates the underground storage of gas. K.S.A. 55-1201, the definitions section, defines the basic terms. K.S.A. 55-1202 declares, in substance, that the underground storage of natural gas which promotes conservation, which permits the building of reserves for orderly withdrawal in periods of peak demand, and which makes natural gas resources more readily available to consumers promotes the public interest and welfare of this state. The second paragraph then states:

"Therefore *in the manner hereinafter provided the commission may find and determine that the underground storage of natural gas as hereinbefore defined is in the public interest."*

K.S.A. 55-1203 provides that any *natural gas public utility* may appropriate for its use for the underground storage of natural gas any subsurface stratum or formation in any land *which the commission shall have found to be suitable and in the public interest for the underground storage of natural gas.*

K.S.A. 55-1204 provides that, as a condition precedent to the exercise of the right of eminent domain as to any property for the underground storage of natural gas, the natural gas public utility shall obtain from the state corporation commission a certificate setting out the findings of the commission (1) that the underground stratum or formation sought to be acquired is suitable for the underground storage of natural gas and that its use for such purposes is in the public interest; and (2) the amount of recov-

erable oil and native gas, if any, remaining therein. Section (b) of 55-1204 provides that the commission shall issue no such certificate until after public hearing is had on application and upon reasonable notice to interested parties. Section (c) provides that certain provisions of Kansas Statutes Annotated (chapter 66 providing for rules and regulations) shall be applicable to all proceedings of the commission under K.S.A. 55-1201 *et seq.*

K.S.A. 55-1205 provides the procedure by which a natural gas public utility, having first obtained a certificate from the commission, shall exercise the right of eminent domain for the purpose of acquiring property for the underground storage of natural gas. K.S.A. 55-1207, which was enacted in 1961, provides for the leasing of state-owned land for the underground storage of natural gas.

From our analysis of the Kansas statutory scheme as contained in K.S.A. 55-1201 *et seq.*, it is clear that the expressed intention of the legislature is that the condemnation of property for the underground storage of natural gas is restricted to natural gas public utilities. Furthermore, it is clear that under the legislative scheme, before an underground gas storage area may be established, a certificate must be obtained from the Kansas Corporation Commission containing the findings set forth in K.S.A. 55-1204, after a public hearing with reasonable notice to interested parties.

In determining the issue presented in this case, this court has the obligation to consider more than the relative merits and demerits of the wild animal theory adopted in *Hammonds* and rejected in some of the cases. This court has the further duty to carry out the legislative intent as expressed in K.S.A. 55-1201 *et seq.* We have concluded that, in order to carry out the legislative intent and to adopt a rule which will be fairest and most beneficial to the people of this state, in a factual situation such as is presented in this case, where the landowner, Beech Aircraft Corporation, is not a natural gas public utility and has attempted to create an underground storage reservoir under the property of an adjoining landowner without acquiring by contract the right to do so, the law of capture should be applied to any non-native gas which is purchased elsewhere and injected into the common pool for storage. We thus hold that Beech Aircraft lost its owner-

ship of the stored gas after injecting it into the reservoir in this case.

In arriving at this conclusion, we have considered the undesirable consequences of the position which Beech Aircraft has asserted in this case. Beech Aircraft contends that it has the right to store gas under the land of an adjoining landowner without obtaining a permit, license, or rights afforded by condemnation, and without paying any rentals or other compensation. In our judgment, the adoption of such a rule would result in extensive litigation between adjoining property owners in the oil and gas areas of this state. For example, if there is gas production near a storage reservoir on land without license for gas storage, there is a bound to be litigation to determine how much of the gas being produced is native and how much is stored gas, what damages are owed to what adjacent landowner for the storage of unauthorized gas, and who is entitled to what share of the gas produced.

We also are convinced that by applying the law of capture, as traditionally followed in this state, the court would be carrying out the Kansas statutory scheme as set forth above in K.S.A. 55-1201 *et seq.* The court in *Strain v. Cities Service Gas Co.*, 148 Kan. 393, recognized that the regulation of the underground storage of natural gas is a matter for the consideration of the legislature. In the event the legislature should determine that it would be in the best interests of the people of Kansas to adopt different legal principles to regulate the storage of gas, that is a matter for future legislative action.

For the reasons set forth above, we hold that the trial court correctly determined that, under the circumstances of this case, where a natural gas public utility was not involved, where no certificate authorizing an underground storage facility had been issued by the Kansas Corporation Commission, and where the defendant had used the property of an adjoining landowner for gas storage without authorization or consent, the defendant, as the owner of non-native natural gas, lost title thereto when it injected non-native gas into the underground area and the gas was then produced from the common reservoir located under the adjacent property.

The judgment of the district court is affirmed.