No. 100,282

NORTHERN NATURAL GAS COMPANY, *Plaintiff*, v. MARTIN,
PRINGLE, OLIVER, WALLACE & BAUER, L.L.P., *Defendant*.

(217 P.3d 966)

Opinion filed October 9, 2009.

*Alan L. Rupe*, of Kutak Rock LLP, of Wichita, argued the cause, and *Richard A. Olmstead*, of the same firm, was with him on the briefs for the plaintiff.

*Steven D. Ruse*, of Shughart Thomson & Kilroy, P.C., of Overland Park, argued the cause, and *Jason L. Bush*, of the same firm, was with him on the briefs for the defendant.

*Will B. Wohlford* and *Jeffery L. Carmichael*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, were on the brief for *amici curiae* Val Energy, Inc., and Nash Oil & Gas, Inc.

*James D. Oliver*, of Foulston Siefkin LLP, of Overland Park, *Jim H. Goering* and *Timothy B. Mustaine*, of the same firm, of Wichita, and *John V. Black*, of Black's Law Office, PA, of Pratt, were on the brief for *amici curiae* Trans Pacific Group and Trans Pacific Royalty Owners.

*Per Curiam*: This case presents a certified question from the United States District Court for the District of Nebraska relative to a pending action in which Northern Natural Gas Company (Northern) is claiming professional negligence/malpractice against its former legal counsel, Martin, Pringle, Oliver, Wallace & Bauer, L.L.P. (Martin Pringle). The legal malpractice claim in Nebraska emanates from Martin Pringle's representation of Northern in an

action against Trans Pacific Oil Corporation in the United States District Court for the District of Kansas. With respect to the certification order, the parties stipulated to the following facts:

"1. Northern is a Delaware corporation with its principal place of business in Omaha, Nebraska.

"2. Martin Pringle is a Kansas limited liability law partnership formed in Kansas.

"3. Northern engaged Martin Pringle to represent its legal interests in various matters, including but not limited to, litigation captioned *Northern Natural Gas Company v. Trans Pacific Oil Corporation, et al.*, No. 02-1418-JTM (D. Kan.) (hereinafter *'Trans Pacific'* litigation).

### "Natural Gas Storage

"4. The Federal Energy Regulatory Commission ('FERC') is the federal agency charged with overseeing gas storage activities under the Natural Gas Act, 15 U.S.C. 717, et seq.

"5. The Kansas Corporation Commission ('KCC') oversees gas storage operations in Kansas. Among other things, it has created procedural mechanisms for natural gas storage field operators to provide notice of any potential leak of a storage field and procedures for an operator to request an expansion of the boundaries of an existing storage field. See KAN. ADMIN. REGS. 82-3-1002(f), 82-3-1003(i), 82-3-1003(k)(1)(B), 82-3-1006 (c).

"6. In 1993, the Kansas Legislature enacted KAN. STAT. ANN. 55-1210, which provides, in relevant part, as follows:

'(c) With regard to natural gas that has migrated to adjoining property or to a stratum, or portion thereof, which has not been condemned as allowed by law or otherwise purchased:

(1) The injector . . . shall not lose title to or possession of such gas if such injector . . . can prove by a preponderance of the evidence that such gas was originally injected into the underground storage.

1993 Kan. Sess. Laws, Ch. 102, 1.

"7. The statute took effect July 1, 1993.

"8. Litigation concerning the general topic of storage gas migration in Kansas has occurred both before and after the enactment of KAN. STAT. ANN. 55-1210.

### "Northern's Natural Gas Storage Activities in Kansas

"9. Northern owns and operates an underground natural gas storage field in and around Cunningham, Kansas.

"10. The Cunningham Field was discovered in approximately 1931.

"11. Northern is an 'injector' within the meaning of KAN. STAT. ANN. 55-1210.

"12. The shallowest formation in the Cunningham Field is the Kansas City/Lansing formation.

"13. Deeper formations—including the Simpson formation, the Viola formation and the Arbuckle formation—were historic producers of oil and gas, but production ultimately depleted the native reserves in these formations.

"14. In approximately the mid- to late-1970's, Northern began its gas storage operations in the Cunningham Field.

"15. The KCC and the Federal Power Commission, the predecessor to the FERC, authorized Northern to store gas in the Viola formation.

"16. Later, the KCC and FERC authorized Northern to store gas in the Simpson formation, as well as the Viola formation.

"17. In 1987-1988, Trans Pacific Oil Corporation ('Trans Pacific') drilled two wells on property adjacent to the northern certificated boundary of Northern's storage field.

"18. The Trans Pacific wells, known as the Park 1 and the Park 1A wells ('Park wells') produced oil as well as natural gas.

## "TRANS PACIFIC ACTION

"19. In November 2002, Northern commenced litigation against Trans Pacific and other related entities, claiming Trans Pacific was producing gas at the Park wells that had migrated from Northern's Cunningham storage field. One issue in the *Trans Pacific* litigation was whether Northern was permitted to make a claim for gas that had allegedly migrated to the Park wells before July 1, 1993, the effective date of KAN. STAT. ANN. 55-1210, but which had not been produced by Trans Pacific prior to that date.

"20. In the Trans Pacific litigation, the District Court submitted a Special Verdict Form to the jury with the following as Question 1: 'On or after July 1, 1993, did Northern's stored gas migrate to the area of the "No. 1 Park" and "No. 1 Park A" wells?' The jury answered 'no' to this question.

"21. On appeal, Northern challenged the District Court's interpretation of KAN. STAT. ANN. 55-1210 contained in Question 1 of the Special Verdict Form.

"22. The Tenth Circuit issued an Order and Judgment in which it is held as follows on that issue:

'However, Northern did not object to Special Verdict Form Question 1, which contained the court's "interpretation" of 55-1210 and specifically asked the jury to determine whether Northern's stored gas had migrated to Trans Pacific's wells on or after July 1, 1993, at either the instruction conference or upon it being submitted to the jury. Therefore, Northern has waived the right to appellate review. *Northern Natural Gas Co. v. Trans Pacific Oil Corp.*, 248 Fed. Appx. 882, 888-89 (10th Cir. 2007).'

## "NEBRASKA LITIGATION

"23. Northern asserts a claim of professional negligence/malpractice against its former legal counsel, Martin Pringle, relating to the Trans Pacific litigation.

"24. To prevail on its claim, Northern must demonstrate, among other things, an alleged breach in the failing to preserve for appeal the issue of the proper interpretation of KAN. STAT. ANN. 55-1210."

The Nebraska federal district court found that "[i]t appears to the Court that an issue of Kansas state law may be determinative of this litigation and there is no clear controlling Kansas state law precedent." Accordingly, it certified the following question:

DOES AN INJECTOR OF NATURAL GAS INTO UNDERGROUND STORAGE, WHO DEMONSTRATES SUCH GAS WAS ORIGINALLY INJECTED INTO UNDERGROUND STORAGE BUT MIGRATED TO ADJOINING PROPERTY OR TO A STRATUM OR PORTION THEREOF WHICH HAS NOT BEEN CONDEMNED AS ALLOWED BY LAW OR OTHERWISE PURCHASED, LOSE TITLE TO OR POSSESSION OF THE MIGRATED GAS WHEN THE GAS MIGRATED BEFORE JULY 1, 1993, THE EFFECTIVE DATE OF THE CONTROLLING STATUTE, KAN. STAT. ANN. 55-1210, AND WAS NOT CAPTURED OR REDUCED TO POSSESSION BY ANOTHER PRIOR TO JULY 1, 1993?

*ENABLING STATUTE/STANDARD OF REVIEW*

The Uniform Certification of Questions of Law Act, K.S.A. 60-3201 *et seq.*, provides that the Kansas Supreme Court

"*may* answer questions of law certified to it by . . . a United States district court . . . *when requested* by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the court of appeals of this state." (Emphasis added.) K.S.A. 60-3201.

We review certified questions using an unlimited standard. *American Family Mut. Ins. Co. v. Wilkins*, 285 Kan. 1054, 1058, 179 P.3d 1104 (2008).

*STATUTORY PROVISION*

Northern's arguments center on the interpretation of K.S.A. 55-1210, which was enacted in 1993, with an effective date of July 1, 1993. That statute provides:

"(a) All natural gas which has previously been reduced to possession, and which is subsequently injected into underground storage fields, sands, reservoirs and facilities, whether such storage rights were acquired by eminent domain or oth-

erwise, shall at all times be the property of the injector, such injector's heirs, successors or assigns, whether owned by the injector or stored under contract.

"(b) In no event shall such gas be subject to the right of the owner of the surface of such lands or of any mineral interest therein, under which such gas storage fields, sands, reservoirs and facilities lie, or of any person, other than the injector, such injector's heirs, successors and assigns, to produce, take, reduce to possession, either by means of the law of capture or otherwise, waste, or otherwise interfere with or exercise any control over such gas. Nothing in this subsection shall be deemed to affect the right of the owner of the surface of such lands or of any mineral interest therein to drill or bore through the underground storage fields, sands, reservoirs and facilities in such a manner as will protect such fields, sand, reservoirs and facilities against pollution and the escape of the natural gas being stored.

"(c) With regard to natural gas that has migrated to adjoining property or to a stratum, or portion thereof, which has not been condemned as allowed by law or otherwise purchased:

(1) The injector, such injector's heirs, successors and assigns shall not lose title to or possession of such gas if such injector, such injector's heirs, successors or assigns can prove by a preponderance of the evidence that such gas was originally injected into the underground storage.

(2) The injector, such injector's heirs, successors and assigns, shall have the right to conduct such tests on any existing wells on adjoining property, at such injector's sole risk and expense including, but not limited to, the value of any lost production of other than the injector's gas, as may be reasonable to determine ownership of such gas.

(3) The owner of the stratum and the owner of the surface shall be entitled to such compensation, including compensation for use of or damage to the surface or substratum, as is provided by law, and shall be entitled to recovery of all costs and expenses, including reasonable attorney fees, if litigation is necessary to enforce any rights under this subsection (c) and the injector does not prevail.

"(d) The injector, such injector's heirs, successors and assigns shall have the right to compel compliance with this section by injunction or other appropriate relief by application to a court of competent jurisdiction."

## SUMMARY OF THE PARTIES' ARGUMENTS

In its initial brief, one of Northern's arguments is that the plain language of the statute manifests a legislative intent to vest title to and possession of all storage gas with the injector, regardless of when the gas was injected or when it might have migrated outside the certified boundaries of the gas storage field. It points to the use of the phrases "has been previously reduced to possession" and

"at all times" in K.S.A. 55-1210(a), and "was originally injected" and "has migrated" in K.S.A. 55-1210(c) to support its "plain language" argument.

Northern also contends that public policy considerations dictate that we adopt its interpretation of the statute. It notes that the legislature acknowledged the importance of providing for the storage of natural gas to make natural gas more readily available to consumers and to provide a better year-round market for the gas fields. See K.S.A. 55-1202. Further, Northern contends that requiring it to identify when gas migrated outside the storage field would place an impossible evidentiary burden on the injector.

Further, Northern's view is that K.S.A. 55-1210 abolished the rule of capture in this state with respect to injected gas, and therefore, all injected gas which had not been captured, *i.e.*, produced and reduced to possession, by the adjacent landowner before July 1, 1993, remained the personal property of Northern. On the other hand, Northern also argues that the statute operated to revest the injector with title to the injected gas and such a return transfer of title was recognized in this court's prior decision in *Union Gas System, Inc. v. Carnahan*, 245 Kan. 80, 86, 774 P.2d 962 (1989).

Martin Pringle responded by pointing out that the deep-rooted presumption is that legislation will apply prospectively, unless the legislature clearly and unequivocally manifests its intent to apply a statute retroactively. It argues that the legislature did not manifest that retroactive intent in K.S.A. 55-1210. Moreover, Martin Pringle argues that prior to the July 1, 1993, effective date of K.S.A. 55-1210, Northern had lost title to that injected gas which had migrated outside its storage field under the ownership-in-place concept, which vested ownership in the adjoining landowner so long as the gas remained under that adjacent land. Therefore, a construction of K.S.A. 55-1210 which destroys the adjacent landowner's vested right to produce the gas existing under the adjacent land on July 1, 1993, would constitute an unconstitutional taking of property without just compensation.

Martin Pringle further contends that Northern miscontrued the pre-July 1, 1993, rule of capture to mean that an adjacent landowner had to actually produce the migrated gas to obtain title to

it. Rather, the law firm argues that the ownership-in-place doctrine vested title to the migrated gas in the adjacent landowner when it became part of the adjacent land, regardless of whether the gas had been produced. Likewise, Martin Pringle argues that Northern's reliance on the *Union Gas* case is misplaced because that case dealt with a formal expansion of the storage field through certification and condemnation, an action which Northern could have attempted, but did not. Martin Pringle also attempts to debunk Northern's public policy arguments by: (1) pointing out the other remedies which are available to a gas storage field operator when the stored gas migrates to adjacent land, such as seeking formal expansion of the storage field boundaries; and (2) explaining how an injector can prove the time at which gas migrated with the aid of a computer-generated simulation, an example of which was attached to its brief.

In its reply brief, Northern asserted that it is not seeking a retroactive application of K.S.A. 55-1210, notwithstanding its declaration that the statute abolished the rule of capture and any supplemental ownership-in-place doctrine. The apparent argument is that adjacent landowners had no right, title, or interest in uncaptured injection gas, so that the statute took nothing away from them. Northern also made the rather incredible argument that Martin Pringle did not have standing to argue against an unconstitutional interpretation of the statute because the law firm did not have any claim to the migrated gas. See *Martin v. Kansas Dept. of Revenue*, 285 Kan. 625, 629-30, 176 P.3d 938 (2008) (court has duty to construe statute in a constitutional manner).

In addition to the parties involved in the Nebraska malpractice action, other entities joined the fray in our court. Trans Pacific Group and Trans Pacific Royalty Owners (collectively referred to as Trans Pacific) filed a motion requesting leave to file an *amicus curiae* brief, a motion to argue, and a motion to continue. Val Energy, Inc., and Nash Oil & Gas, Inc. (Nash), filed a motion for leave to file an *amicus curiae* brief and a motion to argue. We granted the motions to file *amicus curiae* briefs but denied the motions to argue and to continue.

Trans Pacific points out that the "question as to the proper interpretation of K.S.A. 55-1210(c)(1) previously arose, was briefed, and was decided adversely to Northern in *Northern Natural Gas Co. v. Trans Pacific Oil Corp.*, 2005 WL 2334688 (D. Kan.), *aff'd* 248 Fed. Appx. 882 (10th Cir. 2007)." Trans Pacific suggests that Northern's certified question is a thinly veiled attempt to obtain a different interpretation of the statute from state court in an action where the potentially adversely affected landowners or royalty owners are not participating. It challenges the obtuse wording of the question and contends the factual premise upon which it is based is implausible. Given that the jury found no migration after July 1, 1993, Northern would have to prove that its storage gas was migrating to Trans Pacific's wells prior to July 1, 1993, but somehow the migration stopped when the legislature passed the statute. On the merits of the question, Trans Pacific's arguments against a retroactive application of the statute track those of Martin Pringle but do so utilizing facts from the underlying litigation that are outside the facts submitted with the certified question.

Val Energy and Nash were not parties to the underlying case. However, Northern sued Nash in the federal District of Kansas, alleging that their wells were producing storage gas that had migrated outside of Northern's storage field. The district court granted summary judgment in favor of Nash on statute of limitations grounds and alternatively on the preclusive effect of the jury trial in *Trans Pacific*. The Tenth Circuit Court of Appeals affirmed the decision on the statute of limitations grounds. *Northern Natural Gas Co. v. Nash Oil & Gas, Inc.*, 506 F. Supp. 2d 520 (D. Kan 2007), *aff'd* 526 F.3d 626 (10th Cir. 2008). Northern also filed suit against Val Energy but dismissed the claims without prejudice. Val Energy claims that the case was dismissed pending the determination of this certified question.

Val Energy argues that we should decline to answer the certified question because it is not determinative of any issues in the malpractice lawsuit. It contends that even if the certified question is answered in Northern's favor, Northern would still have to prove all of the elements of the malpractice claim, including that it would have received a favorable decision from the Tenth Circuit. On the

merits, the *amicus* brief reiterates that the legislature did not manifest an intent to apply the statute retroactively and argues that the public policy cannot be to give injectors unlimited rights to the detriment of pre-existing property rights.

Both Northern and Martin Pringle filed reply briefs to address the *amici curiae* briefs. Northern essentially rebutted every point made by the *amici*, injecting more facts not in the record. Martin Pringle argued the propriety of the certified question, asserted its standing to argue against an unconstitutional interpretation of K.S.A. 55-1210, and declared its agreement with the *amici's* interpretation of the statute.

## PROPRIETY OF CERTIFIED QUESTION

*Amici* assert that the certified question presented will not be determinative in the legal malpractice action from which it comes. They suggest that the parties' joint motion to certify the question was a manipulative attempt to obtain a collateral reversal of the federal district court's interpretation of K.S.A. 55-1210. Their arguments are not totally unsupported.

The district court's minute sheet from the Nebraska action accompanied the certification order. That document reflects that Martin Pringle had received an extension of time to file its answer to the legal malpractice petition, and, indeed, had not filed its answer when the Nebraska district court certified the question to this court. Although Northern apparently filed a brief in support of the joint motion for certification, it does not appear that the district court conducted a hearing or that Martin Pringle submitted a brief.

Martin Pringle argues to this court that a certified question is determinative in the underlying litigation when it disposes of a pivotal issue. However, one might ruminate on the efficacy of determining pivotal issues before the defendant answers the petition. For instance, one defense might be that the law firm cannot be held liable for a mistaken opinion on a point of law that has not been settled by a court of last resort and on which reasonable doubt may be entertained by informed lawyers. See *Bergstrom v. Noah*, 266 Kan. 847, 880, 974 P.2d 531 (1999). A subsequent opinion settling the point of law is not determinative on that defense. Like-

wise, an answer to the certified question from this court that favors Martin Pringle does not unequivocally establish that the Tenth Circuit Court of Appeals would have reached the same conclusion in the actual *Trans Pacific* litigation. We find the discussion of certification by the New Mexico Supreme Court to be more persuasive:

"The intent of the certification of facts and determinative answer requirements is that this Court avoid rendering advisory opinions. Relative to the first requirement, it is sufficient if the certification of facts and the record contain the necessary factual predicates to our resolution of the question certified, and it is clear that evidence admissible at trial may be resolved in a manner requiring application of the law in question. Relative to the second requirement, our answer must be determinative in that it resolves the issue in the case out of which the question arose, and the resolution of this issue materially advances the ultimate termination of the litigation." *Schlieter v. Carlos*, 108 N.M. 507, 508, 775 P.2d 709 (1989).

Moreover, Northern's arguments to this court give credence to the *amici*'s position. Rather than relate its proposed answer to the legal malpractice action, Northern focuses entirely on the reasons it should win against the absent adjacent landowners/royalty owners. For instance, in denying that it is asking for a retrospective statutory interpretation, Northern declares that "Northern merely seeks to lawfully protect its substantial capital investment in natural gas storage inventory by maintaining title to natural gas previously produced, purchased, and injected by Northern at great expense into underground storage facilities ultimately for the benefit of natural gas consumers."

Likewise, Northern's challenge to Martin Pringle's standing to raise the unconstitutional taking issue plays squarely into *amici*'s arguments that Northern is seeking to take advantage of the adjoining landowners' absence in this action.

Nevertheless, by ordering a briefing schedule, this court implicitly accepted the certified question from the Nebraska district court. We are loathe, at this late date, to find that the Nebraska court erred in its findings that the question was determinative of the action in that court. Accordingly, we will proceed to the merits of the certified question.

However, we pause briefly to discuss this court's apparent prior practice of accepting all certified questions without prior review.

K.S.A. 60-3201 clearly says this court "may" answer such questions. Other states have exercised that discretion. See, *e.g.*, *CSX Transportation, Inc. v. City of Garden City*, 279 Ga. 655, 658, 619 S.E.2d 597 (2005) (declining to answer certified questions because the questions had been addressed previously, were advisory, were anticipatory, or should be made under federal law); *Brady v. PPL Montana, LLC*, 343 Mont. 405, 405-06, 185 P.3d 330 (2008) (declining to address certified question because unwilling to address constitutional issues in a vacuum); *Grant Creek Water Works v. Com'r of Rev.*, 235 Mont. 1, 3-4, 775 P.2d 684 (1988) (declining to answer because the issue presented would not control outcome of tax court litigation and believed the tax court could resolve the issues of Montana law by applying well-settled principles of statutory construction); *Luckey v. Butler Cty.*, 112 Ohio St. 3d 1467, 861 N.E.2d 142 (2007) (after reviewing preliminary memoranda pursuant to court rules, declines to answer certified question); *Ball v. Wilshire Ins. Co.*, 184 P.3d 463, 466-67 (Okla. 2007) (declining to answer certified question because it may result in an advisory opinion because federal case may be dismissed for lack of jurisdiction, and see footnote 13 listing cases declining to address certified question); *Cray v. Deloitte Haskins & Sells*, 925 P.2d 60, 62 (Okla. 1996) (declining to answer certified question because it was appellate review of a federal judge's ruling under the guise of a certified question); *Jefferson v. Moran*, 479 A.2d 734, 738 (R.I. 1984) (declining to answer because addressing certified question is discretionary and the answer would not resolve the controversy because state court involvement was necessary for the party to get relief); *Hoffman v. Regence Blue Shield*, 140 Wash. 2d 121, 128, 991 P.2d 77 (2000), *disapproved on other grounds Wash. Indep. Tel. Ass'n v. WUTC*, 148 Wash. 2d 887, 64 P.3d 606 (2003) (declining to answer second certified question because "any decision without a complete record could affect issues outside the questions certified and possibly bind entities who are not parties"). Henceforth, we intend to join our sister states in exercising our discretion on questions certified to this court.

## PRIOR LAW

As a prelude to our discussion of the interpretation of K.S.A. 55-1210, we will review what the law was immediately prior to the

July 1, 1993, effective date of that statute. We begin with a century-old case, establishing that petroleum and gas belonged to the owner of the land "as long as they are on it, or in it, or subject to [the landowner's] control. When they escape and go into other lands, or come under another's control, the title of the former owner is gone." *Zinc. Co. v. Freeman*, 68 Kan. 691, 696, 75 Pac. 995 (1904). Under this "ownership in place theory," Kansas landowners owned a present estate in the oil and gas in the ground. *Mobil Oil Corp. v. Kansas Corporation Commission*, 227 Kan. 594, 609, 608 P.2d 1325 (1980); see *Richards v. Shearer*, 145 Kan. 88, 64 P.2d 56 (1937).

That caselaw was developed with respect to native gas, rather than gas which had been captured and then returned to its natural habitat for storage purposes. In *Anderson v. Beech Aircraft Corp.*, 237 Kan. 336, 699 P.2d 1023 (1985), this court had an opportunity to review a dispute involving the ownership of non-native gas that Beech Aircraft had injected into an underground reservoir for storage. The specific question presented was:

"Do owners of land and of an oil and gas lease have the right to produce as their own non-native gas from their land, which gas has previously been purchased, injected, and stored in a common reservoir by another landowner having no license, permit, or lease covering the land from which the non-native gas is produced?" 237 Kan. at 340.

The *Anderson* court explained:

"As far as natural gas is concerned, Kansas has long recognized the law of capture, holding that natural gas in the ground is part of the real estate until it is actually produced and severed. At that point, it becomes personalty. *Burden v. Gypsy Oil Co.*, 141 Kan. 147, 40 P.2d 463 (1935); *Gas Co. v. Neosho County*, 75 Kan. 335, 89 Pac. 750 (1907); *In re Estate of Sellens*, 7 Kan. App. 2d 48, 637 P.2d 483 (1981), *rev. denied* 230 Kan. 818 (1982)." 237 Kan. at 342.

The opinion then reviewed cases from outside jurisdictions addressing the issue of title to stored gas. For instance, some courts adopted a nonownership theory whereby once non-native injected gas migrated into the land of an adjoining landowner, an owner of the non-native gas was not liable for trespass because he no longer owned the gas. See *Bezzi v. Hocker*, 370 F.2d 533 (10th Cir. 1966); *Hammonds v. Central Kentucky Natural Gas Co.*, 255 Ky. 685, 75

S.W.2d 204 (1934); *Protz v. Peoples Natural Gas Co.*, 93 Pitts. Leg. J. 239, *aff'd* 94 Pitts. Leg. J. 139 (1945). Other courts rejected the nonownership theory, finding that once natural gas was reduced to possession, title was not lost by injecting the gas into a natural underground reservoir. *Cf. Ellis v. Arkansas Louisiana Gas Co.*, 450 F. Supp. 412 (E.D. Okla. 1978), *aff'd* 609 F.2d 436 (10th Cir. 1979), *cert. denied* 445 U.S. 964 (1980); *White v. New York State Natural Gas Corporation*, 190 F. Supp. 342 (W.D. Pa. 1960); *Lone Star Gas Company v. Murchison*, 353 S.W.2d 870 (Tex. Civ. App. 1962); see *Anderson*, 237 Kan. at 342-45.

*Anderson* also looked at various state statutes regulating the underground storage of natural gas. It noted that Missouri and Oklahoma had adopted statutes which made the injected gas subject to the law of capture if it migrated from the contained area. Washington, Georgia, Louisiana, and Colorado statutes provided that injected gas shall remain the property of the injector but preserved the rights of owners to drill through the underground reservoir. 237 Kan. at 345-46. The opinion noted that Kansas statutes permitted natural gas public utilities to condemn property for underground storage of natural gas. 237 Kan. at 346-47.

Ultimately, *Anderson* determined that applying the law of capture carried out the then-existing statutory scheme for underground gas storage. Accordingly, Beech Aircraft lost its ownership of the injected gas which had migrated to adjoining land. However, as Northern points out, the *Anderson* decision was premised upon certain facts: a natural gas utility was not involved; no certificate authorizing an underground storage facility had been issued by the Kansas Corporation Commission; and Beech Aircraft had used the property of the adjoining landowner for gas storage without authorization or consent. 237 Kan. at 348. Nevertheless, as subsequently clarified in *Union Gas System, Inc. v. Carnahan*, 245 Kan. 80, 86, 774 P.2d 962 (1989), those conditions do not save Northern from *Anderson*'s rule.

In *Union Gas*, a natural gas public utility had injected gas in a sandstone formation. The boundaries of the storage area were unknown, but Union Gas suspected that it extended onto an adjoining landowner's farmland. The adjacent landowners rejected Union

Gas' attempts to obtain a storage lease even though the landowners were aware the company believed its injected gas was migrating to the adjoining land. After the *Anderson* decision, the landowners and their lessees began production of both native and non-native natural gas from the adjoining land.

Eventually, Union decided to condemn the landowners subsurface for its use in underground gas storage. K.S.A. 55-1204 required Union Gas to obtain a certificate from the Kansas Corporation Commission (KCC) as a condition precedent to filing its petition of condemnation. The KCC issued its certificate on January 13, 1986, and on March 11, 1986, Union Gas filed its statutory condemnation petition in district court. A number of issues arose in the condemnation which found their way to this court on appeal.

One of the holdings in *Union Gas* was that the injector was entitled to an offset against the condemnation award for the gas which was produced by the adjacent landowner from and after the January 13, 1986, certification date, rather than from April 9, 1987, which was the actual date of taking in the condemnation action. Interestingly, the opinion required that the offset value of the gas had to be reduced by Union Gas' share of the cost of production, which specifically included a reasonable rental for the use of the adjacent land for storage, *i.e.*, recognizing that an injector takes something of value from an adjacent landowner when it stores its migrated gas under the adjacent land without consent or authority. 245 Kan. at 88-89. Nevertheless, Northern divined that a "key principle" emerged from *Union Gas'* holding on the certificate date offset, which it stated as: "title to migrated storage gas previously subject to the Rule of Capture revests in the injector immediately when the Rule of Capture ceases to apply." Of course, *Union Gas* said no such thing.

To the contrary, *Union Gas* specifically rejected the injector's attempt to recover a setoff for all of the migrated injection gas that the landowners had produced, based upon *Anderson*. Union Gas, like Northern, tried unsuccessfully to distinguish *Anderson* by arguing that it, unlike Beech Aircraft, was a natural gas public utility. *Union Gas* clarified that such a utility has the statutory ability to obtain a certificate for an underground gas storage area and that

the failure to use that remedy places the utility squarely under the rule of *Anderson*. 245 Kan. at 86-87. Given that Northern did not obtain a certificate to condemn the adjacent landowners' property prior to July 1, 1993, the adjoining landowners possessed a right, title, and interest in and to the gas which had migrated to the adjoining property as of that date.

*INTERPRETATION OF K.S.A. 55-1210*

Northern does not seriously dispute the general proposition that a statute operates prospectively unless its language clearly indicates the legislature intended it to operate retrospectively. See *Owen Lumber Co. v. Chartrand*, 276 Kan. 218, 220, 73 P.3d 753 (2003). Instead, it asks us to parse the statute to find clear intent from the use of the present perfect tense. To the contrary, as Martin Pringle points out, the legislature is well aware of the presumption against retroactive application of a statute and has on many occasions demonstrated an ability to clearly and unequivocally state its retroactive intention without relying solely on verb tense. See *State v. Sutherland*, 248 Kan. 96, 106, 804 P.2d 970 (1991).

Additionally, substantive laws affect vested rights, and as such they are not subject to retrospective legislation which would constitute the taking of property without due process. *Owen Lumber Co.*, 276 Kan. at 221-22. As discussed above, prior to July 1, 1993, the landowners adjoining Northern's underground gas storage area possessed the legal right to produce and keep the injected gas which had migrated onto their property, unless and until Northern obtained a certificate to expand its storage area onto their land and paid them for that privilege through a condemnation action. K.S.A. 55-1210 abolished that right, as well as permitting migrating gas to trespass upon adjoining land. Such a substantive change to vested rights cannot apply retroactively.

Accordingly, we answer the certified question, "yes." An injector of natural gas into underground storage, who demonstrates such gas was originally injected into underground storage but migrated to adjoining property or to a stratum or portion thereof which has not been condemned as allowed by law or otherwise purchased, loses title to or possession of the migrated gas when the gas mi-

grated before July 1, 1993, the effective date of the controlling statute, K.S.A. 55-1210, and was not captured or reduced to possession by another prior to July 1, 1993.