No. 62,613

UNION GAS SYSTEM, INC., *Appellant,* v. GLEN CARNAHAN; NATURAL GROWTH MINERALS AND RESOURCES, INC., a Colorado Corporation; HAROLD L. DeTAR; ANNA JOSEPHINE DeTAR; BOB TERLIP; BOB VENA; SALEM PIPELINE COMPANY, INC.; NORTHWEST CENTRAL PIPELINE CORPORATION; and SCISSORTAIL NATURAL GAS COMPANY, *Appellees,* and HAROLD L. DeTAR; ANNA JOSEPHINE DeTAR; GLEN CARNAHAN; NATURAL GROWTH MINERALS and RESOURCES, INC., a Colorado Corporation; BOB TERLIP; BOB VENA, *Cross-appellants,* v. UNION GAS SYSTEM, INC.; and the KANSAS CORPORATION COMMISSION, MICHAEL LENNEN, MARGALEE WRIGHT, and KEITH R. HENLEY, as members of the Commission, *Cross-appellees.*

(774 P.2d 962)

Opinion filed May 26, 1989.

*Jon R. Viets,* of Independence, argued the cause and was on the briefs for appellant/cross-appellee Union Gas System, Inc.

*John R. Horst,* of John R. Horst, P.A., of Caney, argued the cause and was on the brief for appellees/cross-appellants.

*Charles V. Garcia,* assistant general counsel, argued the cause and *Frank A. Caro, Jr.,* general counsel, was with him on the brief for cross-appellee Kansas Corporation Commission

The opinion of the court was delivered by

HERD, J.: This is a consolidation of two natural gas cases transferred from the Court of Appeals pursuant to K.S.A. 20-3018(c). The first case, *Union Gas System, Inc. v. Glen Carnahan et al.,* stems from an action filed by Union Gas System (Union) on August 1, 1985, seeking condemnation and quiet title. Union also asked for an accounting and punitive and exemplary damages, and for an injunction against further production of natural gas. The second case, *Harold L. DeTar et al. v. Union Gas System, Inc., and the State Corporation Commission,* arises from a petition for judicial review filed March 5, 1986. The petition seeks review of the Corporation Commission's (Commission) orders issued January 13 and February 3, 1986. The district court consolidated the two cases for purposes of all further proceed-

ings on May 7, 1986. In the meantime, Union amended its petition praying for condemnation. The court issued its final order on June 29, 1988. Union appeals and Glen Carnahan, Harold and Anna DeTar, Bob Terlip, Bob Vena, and Natural Growth Minerals and Resources, Inc., cross-appeal.

Union is a natural gas public utility which has long provided service to Southeast Kansas and the Kansas City metropolitan area. The DeTars own the land beneath which is the natural gas in dispute. The DeTars granted an oil and gas lease to Carnahan *et al.*, who sold Terlip and Vena a 30% working interest. The DeTars receive a 15% royalty under the lease.

During World War II, Union's supply of local gas ran low and it applied to the War Resources Board (Board) for steel to lay pipelines to the Hugoton gas field to bring new supplies of gas to its customers. Williams Natural Gas Co. (Williams), formerly operating at different times as Cities Service Gas Co. and as Northwest Central Pipeline Corporation, made a similar request of the Board. The Board granted Williams' request, but, in cooperation with the Federal Power Commission, ordered Williams to provide gas service to Union. Under the order, a special gas purchasing arrangement known as the "P" tariff was established. This allowed Union to purchase gas at favorable rates, but required Union to take its gas at periods of low demand. Thus, the need for a gas storage facility for Union became essential. The "P" tariff provides a savings to Union in the amount of $1,400,000 per year. This is a savings of about $20 a year for each customer.

A subsurface geological reservoir known as the "Squirrel" sandstone formation underlies some of the land in Montgomery County, Kansas. The reservoir was a prolific producer of natural gas in the early part of the century but became depleted by the 1940's. The formation was abandoned because the low pressure, 9.3 pounds per square inch (psi), prevented further economical recovery of gas.

Union acquired the abandoned wells in the late 1940's and early 1950's and obtained gas storage leases from area landowners. The Squirrel Formation became a gas storage reservoir known as the North Liberty Gas Storage Field. Union began injecting gas in the field in 1952. The Squirrel Formation has proven to be well suited for natural gas storage, as it effectively

accepts, holds, and returns injected gas with minimal loss. Approximately 4 billion cubic feet of gas is presently stored in the field, with a market value of approximately $10,000,000.

The price Union may charge for gas is regulated by the Commission. The Commission takes into account the cost of the gas purchased by Union, its cost of operations, and its cost of storage, including gas lost in storage or in transmission. The average annual storage loss ranges from approximately 1.1 to 4.3%. The Commission allows Union to recover a maximum of 4% of lost gas from the consumer through its purchase gas adjustment. Thus, the public bears some of the cost of lost gas, but benefits from the savings resulting from Union's ability to store gas purchased at favorable prices.

The boundaries of the Squirrel sandstone formation are not presently known due to insufficient stratagraphic well tests or control data. The volume of gas in Union's storage reservoir can be calculated, but not the geologic or stratagraphic boundaries. Best estimates show, however, that the Squirrel sandstone pinches out as it runs north from the center of the storage field, which is 65 to 100 feet thick, to the 096N well located just southeast of the DeTar farm, at which point the sandstone is only 8 feet thick. It thus appears the DeTar farm is close to the north boundary of the field.

The DeTars purchased the farm in 1954, and for the next 13 years, Union unsuccessfully attempted to obtain a storage lease on the land. The DeTars were aware of Union's storage operations on adjacent property and that Union was concerned some of its injected gas was migrating to the DeTar land. The DeTars were also aware that Union's storage operations might repressurize old wells drilled many years before on the DeTar land.

As non-native gas is injected into the center of the storage field, it pushes gas to the perimeter of the reservoir, including to the north toward the DeTar farm. Although some commingling occurs, native gas is usually found at the perimeter of the field, while injected gas is found at the center. The parties agree that between 13.7 and 17.7 percent of appellees' production is native gas.

The opinion of *Anderson v. Beech Aircraft Corp.*, 237 Kan. 336, 699 P.2d 1023 (1985), was filed May 10, 1985. It presented the opportunity the DeTars and Carnahan were looking for. The

DeTars had previously leased their land to Carnahan. On June 1, 1985, Carnahan, together with Terlip and Vena, then drilled two wells on the DeTar land, designated as the DeTar No. 1 and No. 2 wells. The DeTars and Carnahan obviously intended to tap the Squirrel sandstone formation in which Union gas was stored.

The newly drilled wells produced significant quantities of gas, which Carnahan, Vena, and Terlip sold to appellees Salem Pipeline Company (Salem) and Scissortail Natural Gas Company (Scissortail). Salem and Scissortail in turn sold the gas to Williams, the supplier of gas to Union. Chemical tests conducted on the gas produced from the DeTar wells indicated it was largely Union gas, mixed with some native gas.

On August 1, 1985, Union filed a petition with the district court seeking (1) to quiet title on the basis of adverse possession; (2) an accounting of the proceeds of appellees' sale of gas injected by Union; (3) punitive and exemplary damages based on conversion of stored gas; and (4) a temporary and a permanent injunction against the further taking of stored gas. On August 21, 1985, the trial court refused to grant a temporary injunction against further production from the DeTar wells, holding Union had an adequate remedy at law through condemnation pursuant to K.S.A. 55-1201 *et seq.* and K.S.A. 26-501 *et seq.*

Thus, on March 11, 1986, Union finally decided to exercise its right as a natural gas public utility to condemn the DeTar subsurface for its use in underground storage of gas. As a condition precedent to the filing of its petition for condemnation, Union sought a certificate from the Commission finding, after public hearing, that the underground formation sought to be acquired was suitable for underground storage of natural gas and that such use would be in the public interest. K.S.A. 55-1204(1).

On January 13, 1986, the Commission issued Union a certificate of its findings, including the following:

(1) The Squirrel sandstone formation has a history of low gas loss and is suitable for the underground storage of natural gas.

(2) The storage of natural gas in the Squirrel sandstone formation is in the public interest.

(3) There were approximately 34 million cubic feet of native gas underlying the DeTar land in 1952, when Union began storage operations. None of this gas is economically recoverable.

The Commission denied cross-appellants' motion for rehearing on February 3, 1986, and on March 5, 1986, cross-appellants filed a petition for judicial review or, alternatively, for an order of mandamus in the district court. That portion of the petition requesting mandamus was dismissed June 25, 1986. Union filed its petition with the district court for statutory condemnation on March 11, 1986.

On May 11, 1986, the trial court agreed to grant a temporary injunction enjoining appellees from further production during their appeal so long as Union posted a $75,000 surety bond. Union failed to post a bond and appellees continued to produce the wells until August 22, 1986, when the wells were shut in.

On June 25, 1986, the trial court affirmed the Commission's certificate. On August 6, 1986, the district court denied Union's claim for quiet title by adverse use and easement by prescription and directed proceedings to continue on Union's supplemental petition for condemnation.

On August 27, 1986, the trial court held that Union had the power of eminent domain as a natural gas public utility and its proposed taking of the Squirrel sandstone formation, the existing well bores, and the equipment on the wells was necessary to the lawful corporate uses of Union. The court then appointed appraisers in accordance with K.S.A. 26-504.

After a two-day hearing, the appraisers awarded $23,043 compensation to working interest owners for lease development expenditures, $7,700 to the fee owners for condemnation compensation, and $37,134 to the royalty owners, overriding royalty interest owners, and working interest owners for native gas.

Union filed a motion with the district court on March 24, 1987, asking for a modification of the award and for a setoff against the award. Union requested a setoff for the value of gas taken by appellees after January 13, 1986, which the trial court instructed the appraisers was the date at which title passed to Union. Union also argued the award should be modified because the appraisers erred in figuring damages separately for each category of owner rather than figuring the sum total of damages and then dividing the total among the owners according to each interest. Finally, Union contended the appraisers erred in awarding the cost of drilling and completing the DeTar wells rather than their actual value at the time of condemnation.

The trial court denied Union's motion on April 3, 1987. Union tendered the award and costs to the court on April 9, 1987, and filed a notice of appeal pursuant to K.S.A. 26-508. Both parties stipulated to a trial before a master, who on May 13, 1988, found the trial court had not erred in its instructions to the appraisers and made an award identical to that entered by the appraisers. The trial court affirmed the master's report on June 29, 1988, after noting the objections filed to the report by both parties.

Union appealed on July 19, 1988, and Carnahan, the DeTars, Terlip, Vena, and Natural Growth Minerals and Resources, Inc., subsequently cross-appealed.

The first issue is whether Union should be allowed to recover for any of its injected gas taken by appellees. In *Anderson v. Beech Aircraft Corp.*, we unanimously held the landowners had the right to recover and keep injected gas which had moved under the landowners' property. We cautioned, however, that this rule applies only "where a natural gas utility was not involved, where no certificate authorizing an underground natural gas storage facility had been issued by the Kansas Corporation Commission, and where a landowner had used the property of an adjoining landowner for gas storage without authorization or consent." 237 Kan. 336, Syl. ¶ 3. Union argues setoff is warranted under *Anderson* because it is a natural gas public utility. However, as we stated in *Anderson*, "it is clear that under the legislative scheme, before an underground gas storage area may be established, a certificate must be obtained from the Kansas Corporation Commission containing the findings set forth in K.S.A. 55-1204, after a public hearing with reasonable notice to interested parties." 237 Kan. at 347.

K.S.A. 55-1204 (amendments on July 1, 1986, and July 1, 1988, not relevant to the case) provides in pertinent part:

"(a) Any natural gas public utility desiring to exercise the right of eminent domain as to any property for use for underground storage of natural gas shall, as a condition precedent to the filing of its petition in the district court, obtain from the commission a certificate setting out findings of said commission:

"(1) That the underground stratum or formation sought to be acquired is suitable for the underground storage of natural gas and that its use for such purposes is in the public interest; and

"(2) the amount of recoverable oil and native gas, if any, remaining therein.

"(b) The commission shall issue no such certificate until after public hearing is had on application and upon reasonable notice to interested parties."

The law was enacted in 1951 and was available to Union in

1952 when it first began using the Squirrel sandstone formation for underground storage. Union chose not to use this remedy and thus placed itself under the rule of *Anderson.* It is not entitled to recover for any of its gas produced by the DeTars prior to January 13, 1986, the date of the Commission's certificate. Production after January 13 will be discussed later.

The second issue is whether the trial court erred in rejecting Union's theory of easement by prescription or adverse possession. K.S.A. 60-503 provides as follows: "No action shall be maintained against any person for the recovery of real property who has been in open, exclusive and continuous possession of such real property, either under a claim knowingly adverse or under a belief of ownership, for a period of fifteen (15) years."

Union concedes it acknowledged the DeTars' ownership between 1954 and 1967, while it unsuccessfully negotiated with them for a lease. It claims, however, that it has had continuous adverse possession for 18 years after negotiations failed, from 1967 to 1985. We find, however, that the statutory elements of open and exclusive possession are lacking. It is true the DeTars knew that Union believed its gas was under their property; in fact, a Union storage observation well was located 300 feet from their property. However, possession was not open, as Union produced no injected gas from the surface of the DeTar property. Actual production of gas is required to establish adverse possession as against the fee owner of the minerals and surface. See 35 A.L.R.2d 124. The element of exclusiveness is not met because Union shared occupancy of the subsurface with the DeTars' native gas. This issue is without merit.

The third issue is the correct "date of taking" for purposes of determining compensation in condemnation proceedings under K.S.A. 55-1201 *et seq.*

The trial court found the date of taking of the DeTars' property to be January 13, 1986, the date the Commission issued its certificate under K.S.A. 55-1204. Union disagrees with the court's finding and argues its taking of the DeTars' property occurred in 1952 when it first injected gas into the Squirrel Formation. This argument ignores the condemnation statutes and relies primarily on the theories of adverse possession and prescriptive easement previously rejected.

Cross-appellants also disagree with the court and argue the

date of taking is controlled by K.S.A. 26-507, which states the interest appropriated in land condemned shall vest in the condemnor, and the condemnor shall be entitled to possession upon payment of the appraisers' award and costs. This must be done within 30 days from the filing of the appraisers' report. We agree that the clear and unambiguous wording of the statute vests title, and entitles Union to possession, on the date it paid the award. Union paid the amount of the award and costs into court on April 9, 1987. We hold that to be the date of taking.

The fourth issue is whether the trial court erred in failing to set off from cross-appellants' condemnation award the value of gas taken by appellees subsequent to January 13, 1986.

Union acquired no rights to the DeTars' property until April 9, 1987. However, the question remains as to its rights to its own gas from January 13, 1986, to April 9, 1987. Since Union established itself as a public utility and was authorized to store its gas underground by the Commission certificate issued on January 13, 1986, it thereafter acquired a changed status. Its operation was given official sanction and its gas was identified. Thereafter it became an exception to the rule of capture expressed in *Anderson.*

Cross-appellants, relying on the rule of capture, legitimately took advantage of Union's pressurizing the Squirrel horizon under the DeTar land without authority and recovered both previously unrecoverable native gas and Union's injected gas which had migrated onto the DeTars' property. They then sold the gas to Salem and Scissortail, who in turn sold it to Williams, who then sold it to Union for reinjection into the North field. This created a clever circle of purloined production, and a successful one under the rule of capture as stated in *Anderson.* But all good things must eventually come to an end. This scheme ended when Union received its certificate of authority from the Commission on January 13, 1986. The law abhors a forfeiture. So, as soon as Union's storage operation became authorized and its gas identifiable, the gas was no longer *ferae naturae* and subject to the rule of capture. The title to Union's captured gas remained in Union. Thus, Union did not forfeit its natural gas produced after January 13, 1986, even though it acquired no title to the DeTars' property until the date of taking, April 9, 1987. Consequently, we hold Union is entitled to a setoff for the value of its

injected gas produced by cross-appellants after January 13, 1986. The value of its gas is the selling price less its share of the cost of production, including a reasonable rental for the use of the DeTars' land.

The fifth issue is whether the Commission erred in failing to determine the total amount of gas under the DeTar property in 1985. Cross-appellants argue, pursuant to *Anderson,* that they should be compensated for the value of injected as well as native gas under the property. The legislature has specified, however, only that *native* gas be considered. See K.S.A. 55-1201(c), K.S.A. 55-1204(a)(2), and K.S.A. 55-1205. Thus we reject cross-appellants' argument and find no error by the Commission.

The sixth issue is whether the Commission erred in basing its estimates of native gas on 1952 studies. Cross-appellants contend the Commission should have attempted to determine how much native gas is presently under the property. They correctly note K.S.A. 55-1201 *et seq.* was intended to operate *prior* to the injection and storage of gas by a natural gas public utility. Because Union had engaged in over 30 years of storage operations before implementing condemnation proceedings, the Commission's only viable option was to determine the amount of recoverable native gas existing in the field before storage operations began in 1952. Its determinations were reasonable, and we find no error. See *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 217 Kan. 604, 617, 538 P.2d 702 (1975).

The final issue is whether the appraisers erred in their method of determining compensation. In a 1963 amendment to K.S.A. 55-1205 (L. 1963, ch. 234, § 79), the legislature directed appraisers to take into consideration the amount of recoverable native gas under land condemned by public utilities for underground natural gas storage. In the same amendment, the legislature codified the unit method of evaluation. See K.S.A. 26-513 (L. 1963, ch. 234, § 13). K.S.A. 55-1205 provides:

"Any natural gas public utility, having first obtained a certificate from the commission as hereinbefore provided, desiring to exercise the right of eminent domain for the purpose of acquiring property for the underground storage of natural gas shall do so *in the manner provided in K.S.A. 26-501 to 26-516, inclusive.* The petitioner shall file the certificate of the commission as a part of its petition and no order by the court granting said petition shall be entered without such certificate being filed therewith. *The appraisers in awarding damages*

*hereunder shall also take into consideration the amounts of recoverable oil and native gas remaining in the property* sought to be appropriated and for such purposes shall receive as prima facie evidence of such amounts the findings of the commission with reference thereto." (Emphasis added.)

K.S.A. 26-513 provides:

"(a) *Necessity.* Private property shall not be taken or damaged for public use without just compensation.

. . . .

"(c) *Partial taking.* If only a part of a tract of land or interest is taken, the compensation and measure of damages are the difference between the value of the entire property or interest immediately before the taking, and the value of that portion of the tract or interest remaining immediately after the taking."

The statute then lists 15 factors to be considered in ascertaining damages, but states these factors "are not to be considered as separate items of damages, but are to be considered only as they affect the *total* compensation and damage" under subsection (c). (Emphasis added.)

The amended statutes show the legislature intended compensation for condemnation of underground gas storage reservoirs to be valued by the unit method, taking into account the native gas recoverable, to arrive at one total sum. Only then may the award be divided according to the proportionate interests.

The appraisers instead used the "summation" method considering the interests of different parties and valuing separately each of several factors which contribute to the value of the property and then adding them all up to a final total. A condemnation award is for the property taken, " 'not for the sum of the different interests therein.' " *City of Manhattan v. Kent,* 228 Kan. 513, 518, 618 P.2d 1180 (1980). We held in *Rostine v. City of Hutchinson,* 219 Kan. 320, 548 P.2d 756 (1976), that the legislature has determined through K.S.A. 26-513 that the unit rather than the summation method is the proper method of appraisal for condemnation compensation.

The unit method of appraisal contemplates evaluation based on fair market value. K.S.A. 26-513(c) codifies the rule that there are only two facts at issue in determining compensation for a partial taking in condemnation: the value of the whole property before the taking and the value of the remaining property after the taking. See *City of Wichita v. May's Company Inc.,* 212 Kan. 153, 510 P.2d 184 (1973). This is the "market data" method of determining condemnation compensation. It is the preferred

method unless the property is so unique its market value cannot be ascertained. Under such circumstances, appraisers are not required to use the unit method of appraisal. *Ellis v. City of Kansas City*, 225 Kan. 168, 172, 589 P.2d 552 (1979).

Cross-appellants argue their property is so unique no market value can be ascertained, and thus the appraisers were not required to use the unit method of appraisal. We hold this contention incorrect for two reasons: (1) The 1963 amendments provide that the unit method will be used to determine the value of subsurface storage; and (2) the market value of the DeTar property may be ascertained. The proper method of valuation is a question of law, to be approved by the trial court, and is subject to review on appeal. See *City of Manhattan*, 228 Kan. at 520.

The fair market value of the DeTar property must be determined by comparing its value "immediately before the taking" and "immediately after the taking." The "taking" occurred April 9, 1987, after Union had received its certification and rights to its own gas underneath the DeTar property. Thus, we hold the appraisers should have been instructed to determine the difference in value of the real estate with subsurface rights and without subsurface rights. Pursuant to K.S.A. 55-1205 and K.S.A. 26-513, factors to be considered in arriving at the "before" value include the amount of remaining recoverable native gas and the salvage value of the equipment on the wells.

In arriving at the value of the remaining native gas in place before the taking, the appraisers may use the amount of gas in place in 1952, times its fair market value, less the cost of production, including compressor costs, and less the value of native gas produced since 1985. The salvage value of equipment and value of the DeTars' real estate should be added to the foregoing figure. This is the fair market value before the taking. The fair market value of the DeTars' real estate without the Squirrel Formation and its native gas should then be determined. This is the fair market value after the taking. The value after the taking subtracted from the value before the taking gives the amount of the award.

With that in mind, let us examine the appraisers' award. Summarized earlier, it is here set out in full for ready reference:

"I.   Union Gas Systems, Inc., et al., to pay working interest owners in the DeTar lease as compensation for lease development expenditures .................................................$23,043.00

"II. Union Gas Systems, Inc., et al., to pay mineral and surface owner DeTar for condemnation of squirrel sand formation on the eighty (80) acre tract in question ............................$ 7,700.00

"III. Union Gas System, Inc., et al., to pay for native gas on lease to the Royalty owners, overriding Royalty owners, and working interest owners in the amount of ........................$37,134.00

"Working Interest × 60% ........................$22,280.00

"Overriding Royalty Interest × 25% ................ 9,284.00

"Royalty Interest × 15% ........................ 5,570.00"

The trial court instructed the appraisers, pursuant to K.S.A. 55-1205, to receive as prima facie evidence the Commission's finding that there was no native gas *economically* recoverable under the DeTar property. However, the appraisers were presented evidence that native gas was "recoverable" under K.S.A. 55-1205 because better economic conditions now justify the use of a compressor to augment the field pressure. Thus, in the third item of the award, cross-appellants are compensated for native gas. The Commission found 34,000 mcf native gas remained under the DeTar property, but the award appears to be based on testimony by cross-appellants' expert witness that 41,260 mcf of native gas was under the DeTar property in 1952, and that due to the existing low reservoir pressure of 9.3 psi, 40 percent of that gas would have been consumed in compression for production, leaving 24,756 mcf of gas, valued at $1.50 per mcf for a total of $37,134. This is the original gross value of the gas. The producing and marketing costs are not included in this item of compensation. Our discussion of production costs follows.

The cost of drilling and completing the DeTar wells was $23,043, which is the first item of the award. Under the unit method of appraisal, the cost of production should be *subtracted* from the gross value of gas, rather than added to the gross value. See *City of Bonner Springs v. Coleman,* 206 Kan. 689, 481 P.2d 950 (1971). Cross-appellants' qualified interest in the gas beneath the DeTar property is perfected only by capture. Drilling and development are necessary and incidental to the owner's realization of the value of subsurface gas. The appraisers were in error if they were attempting to award the $23,043 as a "substitute facilities" measure of compensation, as the DeTar property is not a public entity required by law to perform the function of producing natural gas. See *Urban Renewal Agency of Wichita v. Gospel Mission Church,* 4 Kan. App. 2d 101, Syl. ¶ 4, 603 P.2d 209 (1979), *rev. denied* 227 Kan. 928 (1980).

We are uncertain what the $7,700 in item (2) of the award is intended to compensate. Two possibilities are considered: (1) The item may have been intended as compensation for the rental value of the DeTars' subsurface for gas storage. Such compensation is improper, as this factor is determined by subtracting the fair market value of the DeTar property without the Squirrel Formation from the fair market value of the property with the Squirrel Formation. (2) The item may have been intended to compensate for production value, as it is close to the $7,000 value an expert witness put on the production rights to native gas under the DeTar property, taking into account development and recovery costs, risk, and a discount factor reflecting the time value of money. If so, then the $7,700 should replace the figure earlier arrived at by subtracting development costs from the value of native gas. It is improper to have both figures, as they represent the same interest.

The appraisers should next subtract from the net value of the native gas the amount of native gas already recovered and sold by appellees. From June 1, 1985, to January 13, 1986, the DeTar wells produced 25,201,000 cubic feet of gas. An additional 17,813,000 cubic feet was produced from January 13, 1986, to August 22, 1986, the date the wells were shut in. The Commission determined the percentage of native to injected gas could not be determined from the evidence before it. However, at the hearing before the appraisers, both parties agreed that between 13.7 and 17.7 percent of the gas recovered from the DeTar wells was native. Chemical analysis was made after the Commission hearings of the hydrocarbon molecules of gas samples from each well, and the percentages were determined based on an averaging of the samples from both wells.

We have thus far illustrated how the appraisers may properly figure the value of the native gas by using the amount of gas in place in 1952, times the fair market value, less the costs of production, including compressor costs, and less the value of native gas produced since 1985.

Next, the appraisers should add to the figure the salvage value of the production equipment taken by Union. The only evidence as to the value of the salvageable equipment was that it was worth from $1150 to $1350.

Finally, the appraisers should add to the figure the fair market value of the rest of the DeTars' property before the taking. From this figure should be subtracted the fair market value of the DeTars' property after the taking. This will be the amount of the award.

The Commission's certification and the district court's condemnation and ruling on adverse possession and prescriptive easement are affirmed. We reverse the district court's ruling on the date of taking and the issue of setoff for the value of Union's gas produced after January 13, 1986, and its order approving the appraisers' award. We remand this case for further proceedings with instruction to reappraise the DeTars' property consistent with this opinion.