**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 11, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NORTHERN NATURAL GAS
COMPANY,

      Plaintiff Counter Defendant-
Appellant/Cross-Appellee,

v.

L.D. DRILLING DEFENDANTS,
VAL ENERGY DEFENDANTS,
HUDSON GROUP DEFENDANTS,
and HUFF LANDOWNER GROUP,

      Defendants Counterclaimants-
Appellees/Cross-Appellants,

and

NASH OIL AND GAS
DEFENDANTS, PRATT WELL
SERVICE DEFENDANTS, and
MEIRIES LANDOWNER GROUP,

      Defendants-Appellees/
Cross-Appellants.

Nos. 15-3272, 15-3278, 15-3279,
15-3285, and 15-3286

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 6:10-CV-01232-JTM-DWB)**

---

Richard A. Olmstead, Kutak Rock L.L.P., Wichita, Kansas (Mark D. Coldiron and
Corey A. Neller, Ryan Whaley Coldiron Jantzen Peters & Webber, P.L.L.C.,

Oklahoma City, Oklahoma, with him on the briefs), for Plaintiff Counter Defendant-Appellant/Cross-Appellee.

Daniel J. Buller, Foulston Siefkin L.L.P., Wichita, Kansas, and Adam S. Davis, Wagstaff & Cartmell L.L.P., Kansas City, Kansas (Jim H. Goering, James M. Armstrong, and Timothy B. Mustaine, Foulston Siefkin L.L.P., Wichita, Kansas, for L.D. Drilling, and Brian J. Madden, Wagstaff & Cartmell L.L.P., Kansas City, Kansas, for Nash Oil and Gas, and Jeffrey L. Carmichael, Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita, Kansas, for Val Energy, and Robert R. Eisenhauer, Johnston Eisenhauer Eisenhauer and Lynch, L.L.C., Pratt, Kansas, for Pratt Well Service, with them on the briefs), for Defendants Counterclaimants-Appellees/Cross-Appellants L.D. Drilling and Val Energy, and Defendants-Appellees/Cross-Appellants Nash Oil and Gas and Pratt Well Service.

Stephen E. Robison, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, Kansas (Gregory J. Stucky, David G. Seely, Daniel E. Lawrence, and Ryan K. Meyer, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, Kansas, and Gordon B. Stull and John D. Beverlin, Stull, Beverlin, Nicolay & Haas, L.L.C., Pratt, Kansas, for The Huff Landowner Group, and Robert R. Eisenhauer, Johnston, Eisenhauer, Eisenhauer & Lynch, L.L.C., Pratt, Kansas, for The Meireis Landowner Group, and Jack V. Black and Thomas V. Black, Black's Law Office, P.A., Pratt, Kansas, for The Hudson Landowner Group, with him on the briefs) for Defendants Counterclaimants-Appellees/Cross-Appellants The Hudson Group and The Huff Landowner Group, and Defendants-Appellees/Cross-Appellants The Meiries Landowner Group.

---

Before **TYMKOVICH**, Chief Judge, **LUCERO**, and **PHILLIPS**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

This case arises from condemnation proceedings brought under the Natural Gas Act of 1938 (NGA), 15 U.S.C. § 717 et seq. Northern Natural Gas Company

initiated proceedings against a number of parties[1] to condemn certain rights relating to the storage of natural gas in and under more than 9,000 acres of land in southeast Kansas, known as the Cunningham Storage Field. According to Federal Rule of Civil Procedure 71.1, the district court appointed a three-person commission to determine an appropriate condemnation award. The district court adopted the commission's findings and recommendations in full, and entered final judgment requiring Northern to pay $7,310,427 in principal (the award recommended by the commission), plus interest, for a condemnation award totaling over $8.5 million.

Both sides appealed, asserting various arguments in support of their positions that the award either over- or under-compensated the Landowners and Producers. We REVERSE in part and AFFIRM in part. As we explain, the condemnation award should not have included either (1) the value of storage gas in and under the Cunningham Field on the date of taking, or (2) the lost value of producing such gas after the date of certification, because certification extinguished any property interests the Landowners and Producers may have held in the gas before that date. But we agree with the award's inclusion of value for

---

[1] We refer to one group of parties as the "Landowners," which includes the unrepresented interest owners and three identified groups of landowners—the Hudson Landowner Group, Huff Landowner Group, and Meireis Landowner Group. We refer to another group of parties as the "Producers," which includes four groups of oil and gas producers—the L.D. Drilling Group, Nash Group, Pratt Well Service Group, and Val Energy Group.

Extension Area tracts based on their potential use for gas storage and buffer rights, the commission's valuation for the eight Extension Area wells, and the district court's denial of attorneys' fees.

## I. Background

Northern owns and operates the Cunningham Field, an underground natural gas storage facility that is part of the "Northern System."[2] Before original production depleted the field's natural resources and Northern converted it to a storage facility, the property produced approximately 80 billion cubic feet (BCF) of native natural gas from an underground dolomitic limestone formation known as the Viola Formation.

In 1978, the Federal Energy Regulatory Commission (FERC) and Kansas Corporation Commission (KCC) first certified the Cunningham Field for gas storage.[3] At that time, the field included approximately 25,000 acres of land.

---

[2] The Northern System is a vast network of interstate natural gas pipelines, storage fields, compressor stations, and other appurtenances that connect power plants, local distribution companies, and residential users across nearly 14,000 miles to produce a stable supply of natural gas.

[3] Under both the federal NGA and the Kansas Underground Storage of Natural Gas Act, a natural gas public utility seeking to convert property for underground storage may obtain a "certificate" from the appropriate commission (i.e., the FERC or KCC, respectively). Such certificates of public convenience and necessity may issue upon the commission's determination that the property sought to be acquired is suitable for the underground storage of natural gas and that its use for such purposes is in the public interest. *See* 15 U.S.C. § 717f(c)–(g); Kan. Stat. Ann. § 55-1204. Certificate authority conveys a power

(continued...)

Northern's certified boundaries expanded over time with the addition of a 1,760-acre tract north of the original boundaries on October 30, 2008 (the 2008 Extension Area) and a 12,320-acre area located approximately five or six miles north of the original boundaries on June 2, 2010 (the 2010 Extension Area).[4] In February 2009, before it obtained certificate authority over the entire 2010 Extension Area, Northern negotiated and obtained storage leases on approximately 3,040 acres in the southern part of the 2010 Extension Area.

This appeal concerns property rights related to the storage of natural gas in and under approximately 9,200 acres of land in the vicinity of the Cunningham Field, including some of the Extension Area. Valuation is determined from the "date of taking" for purposes of valuing the relevant property rights. *United States v. Miller*, 317 U.S. 369, 374 (1943) ("[V]alue is to be ascertained as of the date of taking."). For our purposes the parties agree the date of taking is March 30, 2012, which is when Northern perfected its right to take physical possession of the property by posting security and providing notice to relevant landowners. *See* App. 1638–72.

Over the course of its operations, Northern discovered that volumes of storage gas injected into the Cunningham Field did not always match volumes

---

[3](...continued)
of eminent domain. *See* 15 U.S.C. § 717f(h); Kan. Stat. Ann. § 55-1205.

[4] We refer to the 2008 and 2010 Extension Areas collectively as the "Extension Area."

withdrawn from the field. This mismatch indicated that at least some amount of gas was migrating outside of the field's primary storage area boundaries. For example, in the early 1990s Northern discovered that approximately 10 BCF of storage gas had migrated to a sandstone layer directly beneath the Viola Formation, known as the Simpson Formation. In 1996, Northern obtained FERC and KCC approval to include the Simpson Formation within the Cunningham Field's certified boundaries. Later, when Northern began producing gas from the 2010 Extension Area, it noticed that injected volumes were exceeding withdrawn volumes, again indicating gas migration.

Northern subsequently discovered that gas was leaking out of the Cunningham Field across a lengthy fault originally thought to form a physical barrier to gas migration across the field's northern boundaries. In an effort to curb this migration, Northern engaged in an array of legal and administrative efforts against companies that were allegedly producing gas from areas north of the field's boundaries, which tended to draw the storage gas away. After it obtained FERC certification for (and the associated power of eminent domain over) the 2010 Extension Area, Northern initiated proceedings to condemn the land under the NGA.[5]

---

[5] Section 717f(h) of the NGA establishes the relevant right of eminent domain. It provides,

When any holder of a certificate of public convenience and necessity

(continued...)

As part of its initial complaint, Northern sought "[a]n immediate injunction against further exploration, production, and operation . . . to protect and preserve the [Cunningham Field] from irreparable harm done by further production of Northern's storage gas and to comply with the 2010 Certificate Order." *See* App. 273. Northern therefore filed a motion asking the district court to order that the Producers' wells be "shut in" (i.e., closed) pending resolution of its claims. It obtained a preliminary injunction to this effect on December 22, 2010. *See N. Nat. Gas. Co. v. L.D. Drilling, Inc.*, 759 F. Supp. 2d 1282 (D. Kan. 2010); App. 695–96.

---

[5](...continued)
cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided*, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

15 U.S.C. § 717f(h).

Meanwhile, the district court exercised its authority under Federal Rule of Civil Procedure 71.1[6] and appointed a three-person commission with the powers of a Rule 53 "master"[7] to determine an appropriate condemnation award. The commission conducted a trial and recommended an award totaling $7,310,427, including: (1) $5,950,740 for oil and gas in place on the date of taking; (2) $1,086,347 for gas storage and buffer value of the Extension Area tracts; (3) $226,540 for surface takings and damages; and (4) $46,800 for eight Extension Area wells.

The district court adopted the commission's findings and recommendations as its own, and entered final judgment requiring Northern to pay the Landowners and Producers the award recommended by the commission, plus interest. Both sides appealed, challenging various aspects of the condemnation award.

## II. Analysis

---

[6] Federal Rule of Civil Procedure 71.1 governs the procedural aspects of NGA condemnation proceedings. *See* Fed. R. Civ. P. 71.1(a) ("These rules govern proceedings to condemn real and personal property by eminent domain."). It allows a court to "appoint a three-person commission to determine compensation," and gives such a commission "the powers of a master under Rule 53(c)." *See* Fed. R. Civ. P. 71(h)(2).

[7] Federal Rule of Civil Procedure 53 gives a "master"—including a three-person commission appointed pursuant to Rule 71.1—the power to "regulate all proceedings," "take all appropriate measures to perform the assigned duties fairly and efficiently," and "if conducting an evidentiary hearing, exercise the appointing court's power to compel, take, and record evidence." Fed. R. Civ. P. 53(c)(1). In reviewing a master's report, the district court must generally decide de novo all objections to both findings of fact and conclusions of law made or recommended by the master. *See* Fed. R. Civ. P. 53(f)(3)–(4).

-8-

The parties raise a number of issues relating to the valuation of the storage gas and the proceedings below.

*First*, Northern argues that the value of storage gas in and under the Extension Area on the date of taking should not have been included in the condemnation award. This contention also implicates challenges to the commission's valuation of future production and the district court's instruction that, when calculating the value of lost future production, the commission should ignore the inhibition on production triggered by the preliminary injunction that shut in the producing wells.

*Second*, Northern and the Landowners dispute the valuation of gas storage and buffer rights for Extension Area tracts, as well as the inclusion of that value in the condemnation award.

*Third*, the Producers reject the valuation of the eight Extension Area wells, which included only a "salvage" value for casing materials remaining in each wellbore.

*Fourth*, the Landowners and Producers argue they are entitled to additional compensation to cover their attorneys' fees.

We address each of these issues in turn, reviewing the district court's determinations in these condemnation proceedings to determine "whether proper legal standards were applied in resolving the issue of just compensation and whether any supplemental findings of the district court were clearly erroneous."

*United States v. 179.26 Acres of Land*, 644 F.2d 367, 368 (10th Cir. 1981) (citations omitted). We consider a commission's findings "only to see whether the district court properly accepted and approved them as not being clearly erroneous." *Id.* at 368–69 (citations omitted). A district court commits reversible error in adopting the commission's conclusions "only if the commission misapplied the law or made findings contrary to the clear weight of the evidence," and we "will not retry the facts." *United States v. 2,560.00 Acres of Land*, 836 F.2d 498, 501 (10th Cir. 1988) (citations omitted). "[A] determination by the commission based on sharply conflicting evidence should be viewed as conclusively binding." *Id.* (citations omitted).

For the following reasons, we reverse in part and affirm in part. We disagree with the inclusion of the value of storage gas in and under the Extension Area on the date of taking because we find that the Landowners and Producers had no right to produce such gas after the date of certification. We affirm the remaining aspects of the condemnation award and the district court's denial of attorneys' fees.

### A. *Ownership of the Storage Gas in and Under the Extension Area*

Northern first argues the district court erred by requiring it to compensate the Landowners and Producers for the value of "in place" storage gas in and under the Extension Area lands on the date of taking. This issue turns on whether Northern owned the relevant storage gas on March 30, 2012 (i.e., the date of

-10-

taking). Northern maintains that it should not have been required to compensate the Landowners and Producers for "taking" storage gas that it already owned. We agree that Northern owned the gas on the date of taking.

Resolution of this issue requires us to apply Kansas law. The relevant statutory authority is the Underground Storage of Natural Gas Act, which Kansas enacted in 1951 and amended in 1993. The original act was enacted to promote the conservation of natural gas in furtherance of "the public interest and welfare of [the] state," *see* Kan. Stat. Ann. § 55-1202, and set forth various provisions to regulate the underground storage of natural gas. The 1993 amendment, in turn, addresses property ownership rights of injected (rather than native) natural gas, which is at issue here.[8] The injected gas provision provides, in general, that all

---

[8] In full, Section 55-1210 provides,

> (a) All natural gas which has previously been reduced to possession, and which is subsequently injected into underground storage fields, sands, reservoirs and facilities, whether such storage rights were acquired by eminent domain or otherwise, shall at all times be the property of the injector, such injector's heirs, successors or assigns, whether owned by the injector or stored under contract.

> (b) In no event shall such gas be subject to the right of the owner of the surface of such lands or of any mineral interest therein, under which such gas storage fields, sands, reservoirs and facilities lie, or of any person, other than the injector, such injector's heirs, successors and assigns, to produce, take, reduce to possession, either by means of the law of capture or otherwise, waste, or otherwise interfere with or exercise any control over such gas. Nothing in this subsection shall be deemed to affect the

(continued...)

-11-

natural gas "injected into underground storage fields, . . . whether such storage

rights were acquired by eminent domain or otherwise, shall at all times be the

---

[8](...continued)

right of the owner of the surface of such lands or of any mineral interest therein to drill or bore through the underground storage fields, sands, reservoirs and facilities in such a manner as will protect such fields, sand, reservoirs and facilities against pollution and the escape of the natural gas being stored.

(c) With regard to natural gas that has migrated to adjoining property or to a stratum, or portion thereof, which has not been condemned as allowed by law or otherwise purchased:

(1) The injector, such injector's heirs, successors and assigns shall not lose title to or possession of such gas if such injector, such injector's heirs, successors or assigns can prove by a preponderance of the evidence that such gas was originally injected into the underground storage.

(2) The injector, such injector's heirs, successors and assigns, shall have the right to conduct such tests on any existing wells on adjoining property, at such injector's sole risk and expense including, but not limited to, the value of any lost production of other than the injector's gas, as may be reasonable to determine ownership of such gas.

(3) The owner of the stratum and the owner of the surface shall be entitled to such compensation, including compensation for use of or damage to the surface or substratum, as is provided by law, and shall be entitled to recovery of all costs and expenses, including reasonable attorney fees, if litigation is necessary to enforce any rights under this subsection (c) and the injector does not prevail.

(d) The injector, such injector's heirs, successors and assigns shall have the right to compel compliance with this section by injunction or other appropriate relief by application to a court of competent jurisdiction.

*property of the injector.*"  Kan. Stat. Ann. § 55-1210(a) (emphasis added).  And

"[i]n no event shall such gas be subject to the right of the owner of the surface of

such lands . . . or of any person, other than the injector, . . . to produce, take,

reduce to possession, either by means of the law of capture or otherwise, waste,

or otherwise interfere with or exercise any control over such gas."  Kan. Stat.

Ann. § 55-1210(b).

As for "natural gas that has migrated to adjoining property or to a stratum,

or portion thereof, which has not been condemned as allowed by law or otherwise

purchased," the injected natural gas provisions in the Kansas law provide that the

injector "shall not lose title to or possession of such gas if [it] can prove by a

preponderance of the evidence that such gas was originally injected into the

underground storage."  Kan. Stat. Ann. § 55-1210(c)(1).  By its own terms,

however, § 55-1210(c) applies only to gas that has migrated to "adjoining

property" and does not address gas that has migrated *beyond* adjoining property or

within a field's certified boundaries.[9]  As we explain, § 55-1210(c) therefore does

not apply to the gas at issue here.

---

[9]  "Adjoining property" is not further defined in the Kansas Storage Act, but has been interpreted to include "any section adjacent to a storage field," such that "any section of land which touched a section containing a storage field was adjoining."  *See Williams Nat. Gas Co. v. Supra Energy, Inc.*, 931 P.2d 7, 14 (Kan. 1997).  This comports with the "usual and ordinary meaning" of adjoining—i.e., "contiguous or touching"  *Id.* (citation omitted).

The meaning of the Kansas Storage Act is guided by a series of cases from the Kansas Supreme Court decided between 1985 and 2013, including two cases involving Northern in some capacity. In 1985, the court first addressed the interplay between injectors of storage gas and the common law "rule of capture," under which the first person to "capture" a certain resource, such as natural gas, has rightful ownership to it. In *Anderson v. Beech Aircraft Corp.*, 699 P.2d 1023 (Kan. 1985), the court held that Beech Aircraft—a private corporation that was (1) not a natural gas public utility, and (2) did not have a certificate authorizing an underground storage facility, but nonetheless (3) used the property of an adjoining landowner for gas storage without authorization or consent—lost title to non-native gas that it had injected into an underground reservoir. *Id.* at 1031–32. The court made clear that Beech Aircraft attempted to create an underground storage reservoir "without acquiring . . . the right to do so." *See id.* Because Beech Aircraft's activities as an injector were unauthorized, the injected gas became subject to the common law "rule of capture." *See id.* When the gas was subsequently produced by a company with an oil and gas lease on the adjacent land, it became the property of the producing company. Beech Aircraft could not recover for this "lost" gas.

In the next relevant case, *Union Gas System, Inc. v. Carnahan*, 774 P.2d 962 (Kan. 1989), the Kansas Supreme Court further analyzed the effect of certificate authority under Kansas law. In rejecting Union's ownership claim, the

-14-

court held that a natural gas public utility that injected gas into an underground storage field for many years without certificate authority and subsequently sought to recover the value of such gas produced by others, was "not entitled to recover for any of its gas produced . . . prior to January 13, 1986, the date of the Commission's certificate." *Union Gas*, 774 P.2d at 967. The court explained that, before the date of certification, Union had "placed itself under the rule of *Anderson*" by failing to seek a certificate. *See id.* This gas was therefore subject to the rule of capture and, when produced, became the property of the producer.

As for the gas produced *after* the date of certification, Union was entitled to recover its value, because when it acquired the certificate, its status changed; "[i]ts operation was given official sanction and its gas was identified." *See id.* at 968. After the date of certification, then, the gas "became an exception to the rule of capture expressed in *Anderson*." *Id.*; *see also id.* ("[A]s soon as Union's storage operation became authorized and its gas identifiable, the gas was no longer *ferae naturae* and subject to the rule of capture. The title to Union's captured gas remained in Union. Thus, Union did not forfeit its natural gas produced after [the date of certification] even though it acquired no title to the . . . property until the date of taking."). *Union Gas* thus illustrates the importance of certificate authority.

The third case relevant to our analysis addressed § 55-1210(c)'s application to storage gas that had migrated to adjoining property *before* the enactment and

effective date of the statute (i.e., July 1, 1993), but was produced from the property *after* that date. The court held that the injector (Northern) lost title to natural gas it had injected into underground storage but that subsequently migrated to adjoining property prior to July 1, 1993, even though the gas had not yet been produced. *See N. Nat. Gas Co. v. Martin, Pringle, Oliver, Wallace & Bauer, L.L.P.*, 217 P.3d 966, 975–76 (Kan. 2009). Under the common law "ownership-in-place" theory, "petroleum and gas belong[] to the owner of the land 'as long as they are on it, or in it, or subject to [the landowner's] control.'" *Id.* at 974 (citation omitted). For example, the gas belongs to the owner of the land where the gas is located and, when the gas "escape[s] and go[es] into other lands, or come[s] under another's control, the title of the former owner is gone." *Id.* (citation omitted). Kansas state law subsequently modified the common law scheme, but because Northern "did not obtain a certificate to condemn the adjacent landowners' property prior to July 1, 1993, the adjoining landowners possessed," pursuant to the ownership-in-place doctrine, "a right, title, and interest in and to the gas which had migrated to the adjoining property as of that date." *Id.* at 975.

As the court explained,

[P]rior to July 1, 1993, the landowners adjoining Northern's underground gas storage area possessed the legal right to produce and keep the injected gas which had migrated onto their property, unless and until Northern obtained a certificate to expand its storage area onto their land and paid them for that privilege through a condemnation

-16-

> action. [Kan. Stat. Ann. § 55-1210] abolished that right, as well as permitting migrating gas to trespass upon adjoining land.

*Id.* at 976. In other words, before the 1993 amendment to the Kansas Storage Act clarified the property rights to injected natural gas, the common law ownership-in-place theory applied. Section 55-1210, however, "abolished" landowners' common law rights to produce and keep injected gas that migrated onto their properties. The court again emphasized that *certificate authority* is critical, and the "failure" to acquire the proper certification "places the utility squarely under" the rule of capture set forth in *Anderson. See id.* at 975.

Finally, in 2013 the court addressed ownership of "previously injected storage gas that migrated at least 2 to 6 miles beyond the certificated boundaries." *See N. Nat. Gas Co. v. ONEOK Field Servs. Co.*, 296 P.3d 1106, 1121 (Kan. 2013). The *ONEOK* court held that § 55-1210 "abolished the rule of capture as to natural gas which migrates horizontally within a stratum to adjoining property or vertically to a different stratum, but preserved that rule as to natural gas which migrates beyond those boundaries." *Id.* at 1111. As applied to natural gas that migrated horizontally *beyond* property adjoining Northern's certified storage field, the court found that Northern lost title to the gas. Once the gas migrated beyond adjoining property, it "became subject to the rule of capture" and thus became the property of those who produced the gas before June 2, 2010 (i.e., the date Northern obtained certificate authority over the relevant property). *Id.*

Contemporaneously with certification, however, any injector acquires storage rights to the property and thus title to gas injected into its legally recognized storage area. *See id.* at 1120; *see also id.* at 1125 ("[T]o the extent Northern's injected storage gas migrated beyond property adjoining the certificated boundaries of its storage field, . . . Northern lost title to such gas. Consequently, [the producers] had title to any such migrating gas produced by their wells until . . . FERC extended the certificated boundaries of the Field to include [the producers'] wells, or brought those wells onto property adjoining the expansion area."). The court clarified that § 55-1210(a) and (b) "govern ownership rights to previously injected storage gas *that remains within a designated underground storage area*," while § 55-1210(c) governs ownership of gas that has migrated outside of those certified boundaries. *See id.* (emphasis added).

Taken together, Kansas case law and the statutory scheme set forth in § 55-1210 emphasize the importance of timing and certification. Applying those principles here, the date of taking was March 30, 2012, the date on which Northern perfected its right to take physical possession of the property by posting security and providing notice to relevant landowners. App. 1638–72. On this date, Northern held certificates expanding its field boundaries to include all of the Extension Area land. Indeed, it obtained private storage leases covering over 3,000 acres of the 2010 Extension Area in February 2009 (more than three years

before the date of taking) and obtained certificate authority over the entire 2010 Extension Area on June 2, 2010 (nearly two years before the date of taking).[10]

Thus, while the Landowners and Producers may have held certain property rights over the natural gas in and under their land at some point in time *before* Northern obtained the authority (via private lease agreements and proper regulatory certification) to include the property within the Cunningham Field's legal boundaries, these rights had been eliminated by the date of taking. On the date of taking, the gas "in place" in and under the Extension Area land was within the Cunningham Field's certified boundaries as required by Kansas law and, accordingly, was wholly Northern's property. Because of Northern's ownership, the gas was not subject to the rule of capture. Thus, the commission erred by including the value of that gas in the condemnation award when the Landowners and Producers had no vested property rights or ownership interests in the gas on the date of taking.

The Landowners and Producers argue that this interpretation effectuates an impermissible "taking" in violation of the Fifth Amendment. Under the Fifth

---

[10] While the 2008 and 2010 FERC certificates did not change the Cunningham Field's "active storage reservoir" or "certificated capacity," they did expand the field's certified "protective boundary," "designed to protect the storage field from gas losses due to migration." *See* App. 279–311 (2010 Certificate); App. 822–42 (2008 Certificate). While the Landowners and Producers suggest that the distinction between active reservoir boundaries and protective boundaries may be significant, they do not cite any legal authority in support of such a distinction. In any event, our independent review of the applicable law does not reveal any material distinction between the two.

Amendment, private property may not be taken for public use without just compensation. *See* U.S. Const. amend V. The Landowners and Producers claim Northern must pay just compensation for taking their rights to produce any storage gas that migrated onto (1) their property, or (2) property on which they held oil and gas leases. But this argument relies on a fundamental misconception about the rule of capture, which the Landowners and Producers suggest gives them vested property interests in all gas that has migrated, or will ever migrate, to their property. The rule of capture, however, confers only a right to *produce* the migrated gas. It confers no right to the gas itself. To capitalize on their opportunity to "capture" the gas, the Landowners and Producers would have had to actually produce the gas and would then own the produced gas. But here, the Landowners and Producers seek compensation for gas they did not produce but which remained in the ground on the date of taking. Rather than yielding an unconstitutional taking, Kansas law merely prohibits the Landowners and Producers from recovering the value of storage gas that Northern both (1) originally owned and injected, and (2) acquired certificate authority over.

Because we conclude Northern owned all of the gas within its certified field boundaries after the date of certification, we necessarily disagree with the commission's valuation of lost future production from the Extension Area wells (i.e., the value attributable to recoverable gas reserves in the Viola Formation within the 2010 Extension Area on the date of taking). By including the value of

-20-

recoverable storage gas reserves, which the commission determined could be produced and exhausted within approximately 13.76 months from the date of taking,[11] the commission relied on its finding that the Producers had a right to produce such gas. But as we explained, the Producers only had a right to produce the gas until the date of certification (i.e., June 2, 2010). And prior to the date of certification, the Producers had no right to produce the gas on the 3,040 acres that Northern had already leased because, through those leases, Northern "otherwise" acquired storage rights for purposes of § 55-1210(a). In calculating the loss of future production, the Producers should only be awarded the value of what they could prove they would have produced *before* June 2, 2010, and only on the Extension Area lands not including the 3,040 acres that Northern had leased before the date of certification.

Additionally, because the preliminary injunction shutting in the producing wells was not issued until December 22, 2010, any effect would necessarily only apply to potential production *after* the date of certification. We therefore need

---

[11] The Producers challenge the commission's 13.76-month limitation on future production and instead urge us to adopt their so-called "continuous feed" theory. Under the continuous feed theory, which assumes uninterrupted gas migration would have allowed the Producers to produce a steady stream of gas from their Extension Area wells for at least the next twenty years, Northern would be required to pay the Producers the "net present value of all the gas that would have been produced over the next 20 years had there been no condemnation." *See* App. 2145–49. We need not address the merits of this theory because, as we explain, the Producers should only be awarded the value of the gas they could have produced before the date of certification.

not decide whether the district court correctly instructed the commission to disregard the effects of that injunction.

## B. *Valuation of Gas Storage and Buffer Rights*

Northern next argues the district court erred by including, as part of the compensation owed to the Landowners for their Extension Area tracts, the value of gas storage and buffer rights based on the tracts' potential use and proximity to the Cunningham Field. In particular, Northern argues that *any* value of gas storage and buffer rights for the Extension Area tracts was too speculative to be included in the award. The Landowners, on the other hand, contend the district court erred by not attributing *enough* value for gas storage and buffer rights. We disagree with both parties and affirm the district court's inclusion and valuation of gas storage and buffer rights for the Extension Area tracts.

The district court instructed the commission to consider, in determining fair market value, "all of the possible uses to which the properties could have been put, including the highest and best uses, or the most advantageous uses, to which the properties would be reasonably adaptable." *See* App. 1975; *see also id.* at 1970–71 (instructing the commission to consider "[t]he most advantageous use or the highest and best use to which the tract is reasonably adaptable"). But the court also cautioned the commission that its considerations "must not be speculative, conjectural or remote," and the uses considered "must be sufficiently probable and of sufficient duration to have an effect on the fair market value of

the property." *See id.* at 1975.  The district court further advised the commission that the "highest and best use" for a particular property reflects a use that is both legally permissible and physically possible independent of the condemnor's use, and may involve an aggregation or assemblage of separately owned properties. *See id.* at 1976.

These instructions are consistent with Kansas law.  *See, e.g.*, Kan. Stat. Ann. § 26-513(d)(1) (listing, as a factor to be considered in ascertaining the amount of compensation and damages owed for a taking, "[t]he most advantageous use to which the property is reasonably adaptable"); *Kan. City Mall Assocs. v. Unified Gov't*, 272 P.3d 600, 610 (Kan. 2012) ("In determining fair market value, you should consider all of the possible uses to which the property could have been put, including the best and most advantageous use to which the property was reasonably adaptable, but your consideration must not be speculative, conjectural, or remote." (citations omitted; emphasis removed)). And, when evaluating whether a potential use is too speculative, the "crucial question" is whether there was any evidence presented about the probability of such use.  *See Kan. City Mall Assocs.*, 272 P.3d at 610.  The court will generally affirm if there is at least "some evidence in the record . . . to support an inference that [a use] was reasonably probable, given the state of the property and its current use."  *See id*.

Northern "vehemently opposed *any* allocation of value . . . based on a potential use as storage or buffer acres." App. 2156 (emphasis added). The Landowners, in contrast, "had a much more optimistic view of the value of their land for gas storage or buffer purposes" and sought a one-time payment of $2,000 per acre for value derived from gas storage and buffer rights. *See id.* at 2159. The commission found that "the usefulness of the properties as buffer acreage add[ed] an incremental value of $125 per acre to all the tracts in the 2010 Extension Area immediately before the taking." *Id*. at 2163–65. In reaching this middle ground, the commission credited evidence of Northern's own pre-condemnation leasing efforts in the 2010 Extension Area, which (at $22 per acre per year for a standard gas storage lease, discounted at 10% and assuming no annual escalation of the rental price over a 25-year lease) yielded a "net present value of $200 per acre." *Id*. at 2163. But the commission did not agree that the one-time payment of $200 per acre suggested by Northern's leasing efforts was wholly "in line with other data of comparable sales" in the vicinity of the Cunningham Field. *See id.* at 2165. Sales of properties within the 2010 Extension Area, compared with those located further away from the field, suggested that the market did not place "substantial" value on the gas storage or buffer rights. *Id*. at 2163–65. The commission thus "synthesize[d] the value suggested by an income approach [i.e., $200 per acre] with the data on comparable sales" to reach its $125-per-acre determination. *See id.* at 2165.

-24-

Because there was at least some evidence that, if credited by the commission, suggested a discernable market value increase for gas storage and buffer acreage, we affirm the district court's inclusion of such value in the condemnation award.

## C. *Valuation of the Extension Area Wells*

As part of the condemnation, Northern acquired the remnants of eight previously drilled wells and converted them for use as observation wells. The Producers who drilled the wells claim they are entitled to at least the full replacement value for each well (i.e., the cost of drilling a replacement hole), which would be approximately $225,000 per well. But the Producers also argue they should have been compensated for the costs of fully completing a well (i.e., both drilling and equipping), which would be more than $400,000 per well. The district court, however, awarded only a "salvage value" of $5,850 per well recommended by the commission. The $5,850 award reflects the value of the casing materials that remained in the wellbores when Northern acquired the wells.

In rejecting the Producers' arguments, the commission found that a full replacement value was not warranted, because the wells "would be valued by the market as part of the producing reserves that were associated with each well, and the market would not attach any additional value to the wellbore itself, except for the value of any casing remaining in each wellbore on the Date of Taking." *See* App. 2166. Moreover, "there was no evidence of any formations other than the

Viola which might have productive potential in these wellbores," so any replacement wells would be "worthless holes in the ground." *Id.* The commission also found that Northern was not required to compensate the Producers for the costs of equipping the wells, because the Producers "removed the equipment from the wells." *See id.* at 2166 & n. 33. Therefore, "the equipment itself was not taken," but rather only the casing materials remaining in each wellbore on the date of taking. *Id.*

This method of valuation is consistent with Kansas law. *See, e.g.*, *Union Gas*, 774 P.2d at 970 (noting that "factors to be considered in arriving at the 'before' value include . . . the salvage value of the equipment on the wells," and "[t]he cost of drilling and completing" wells is considered a cost of production not included in calculating compensation owed for the taking of wellbores). We therefore conclude that the commission's valuation was adequately supported by the record and affirm the district court's inclusion of the salvage value in the condemnation award.

### D. Attorneys' Fees

Finally, the Landowners and Producers argue they are entitled to additional compensation in the form of attorneys' fees. Although neither the federal NGA nor Federal Rule of Civil Procedure 71.1 contains any provision concerning the award of attorneys' fees, the Landowners and Producers invoke two provisions of Kansas state law in support of their claims. Because we review a district court's

decision not to award attorneys' fees for an abuse of discretion, *see Schell v. OXY USA Inc.*, 814 F.3d 1107, 1126 (10th Cir. 2016), and we are not persuaded that either state statutory provision applies, we affirm the court's denial of attorneys' fees.

*First*, the Landowners and Producers invoke part of the Kansas Storage Act, codified at § 55-1210(c)(3). "[W]ith regard to natural gas that has migrated to adjoining property or to a stratum, or portion thereof, which has not been condemned as allowed by law or otherwise purchased," Kan. Stat. Ann. § 55-1210(c),

> The owner of the stratum and the owner of the surface shall be entitled to such compensation, including compensation for use of or damage to the surface or substratum, as is provided by law, and shall be entitled to recovery of all costs and expenses, including reasonable attorney fees, if litigation is necessary to enforce any rights under this subsection (c) and the injector does not prevail.

Kan. Stat. Ann. § 55-1210(c)(3). According to its text, however, § 55-1210(c)(3) applies only: (1) to natural gas that has migrated to "adjoining property or to a stratum, or portion thereof" that "has not been condemned as allowed by law or otherwise purchased"; and (2) when "litigation is necessary to enforce any rights under [§ 55-1210(c)] and the injector does not prevail." But this case does not involve natural gas that has migrated to *adjoining* property. Instead, it involves natural gas that migrated *beyond* adjoining property (i.e., gas that migrated to the Extension Area prior to the date of certification) and natural gas migrating

-27-

*within* a field's certified boundaries (i.e., after certificate authority brought the Extension Area within the Cunningham Field's certified boundaries). We need not decide whether Northern has prevailed, because we are not convinced that these condemnation proceedings were "necessary to enforce any rights under . . . subsection (c)." Rather, the proceedings were brought under the NGA and primarily involved Kansas common law and statutory provisions § 55-1210(a) and (b), and not (c). We therefore cannot say the district court made any error of law or abused its discretion by declining to award attorneys' fees under § 55-1210(c)(3).

*Second*, the Landowners and Producers invoke § 66-176, which provides, in relevant part,

> Any public utility or common carrier which violates any of the provisions of law for the regulation of public utilities or common carriers shall forfeit, for every offense, to the person, company or corporation aggrieved thereby, the actual damages sustained by the party aggrieved, together with the costs of suit and reasonable attorney fees, to be fixed by the court.

Kan. Stat. Ann. § 66-176. According to its text, § 66-176 applies only to public utilities or common carries that have "violate[d]" some provision of law for the regulation of public utilities or common carriers. As with § 55-1210(c)(3), this statutory provision does not apply here. These condemnation proceedings arose under the NGA and were not predicated on any violations of "the provisions of law for the regulation of public utilities or common carriers." We therefore

-28-

cannot conclude the district court made any error of law or abused its discretion by declining to award attorneys' fees under § 66-176.

* * *

In sum, the district court did not err in refusing to award attorneys' fees under Kansas law.

## III. Conclusion

For the foregoing reasons, we REVERSE the district court's inclusion of the value of storage gas in and under the Extension Area on the date of taking when calculating the condemnation award and its inclusion of future production to the extent that it conflicts with today's holdings. We AFFIRM the district court's valuation of gas storage and buffer rights for Extension Area tracts, valuation of Extension Area wells, and denial of attorneys' fees.[12]

---

[12] In light of this disposition, we deny as moot Northern's pending motion for partial remand to the district court.